[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] State of Connecticut Superior Court for Juvenile Matters Child Protection Session One Court Street TEL (860)343-6456 Middletown, CT 06457 FAX (860) 343-6331
 August 28, 2001 AAG Susan Pearlman MacKenzie Hall 110 Sherman Street Hartford, CT 06105
 In re: Joshua E.
 NOTICE OF ISSUANCE OF COURT'S DECISION Enclosed is a copy of the Memorandum of Decision filed this date by the Honorable Bruce L. Levin, Judge of the Superior Court, in the above matter.
 Doris Sanders, Asst. Juv. Matters Clerk
Copies to:
 Atty. Gerald Gore Atty. Mark Tallo Honorable Christine Keller, Chief Administrative Judge for Juvenile Matters Commissioner Kristine D. Ragaglia, Department of Children and Families Atty. Linda Pearce Prestley, Child Advocate Emily J. Lebovitz, Reporter of Judicial Decisions
 MEMORANDUM OF DECISION
The Department of Children and Families (DCF) has petitioned to terminate the parental rights of the respondent, Melanie E., to her son, Joshua E., on the grounds that she has failed to be rehabilitated to such a degree as would encourage the belief that she could assume a CT Page 11912 responsible position in Joshua's life within a reasonable time.
The petition was tried to the court over a period of five days. The court finds the following facts. The respondent was born on July 20, 1974, the middle child of a married couple. Her mother is an alcoholic and has been for many years. The respondent's parents divorced when she was eleven years old. The respondent remained with her father. Although the respondent's mother remarried and moved some distance away, the respondent and her mother maintained an on-going relationship.
The respondent was an obstinate and defiant adolescent. Her father attempted to discipline her by means of corporal punishment. The respondent's school learned of problems in the home and recommended family counseling. DCF also became involved with the family until the respondent, approaching age 18, announced that she planned to leave the home. DCF then closed its case.
Although the respondent graduated from high school, by her own admission, she "wasn't academically inclined. I went more to see my friends than to go to school." After high school, she proceeded through a progression of low-paying jobs.
In 1989, at the age of fifteen, the respondent started using alcohol and marijuana. By 1992, she had graduated to heroin and cocaine, to which she had been introduced by a boyfriend. In January 1995, she started taking methadone. On April 12, 1995, the respondent gave birth to a child, Richard, out of wedlock. Richard was born at thirty-four weeks gestation and tested positive for methadone. Since his birth he has been in the care of the respondent's father and stepmother.
In October 1996, the respondent entered a substance abuse program. She did not comply with the program's requirements and was discharged for noncompliance.
On September 1997, the respondent gave birth out of wedlock to another child, Joshua, who is the subject of these proceedings. The respondent was unsure of who Joshua's father was. Paternity testing subsequently determined that one of the two men named by the respondent was Joshua's biological father. On May 31, 2001, the court, by consent, terminated that person's parental rights. Accordingly, his rights are not at issue here.
The respondent had used cocaine during her pregnancy with Joshua through the last trimester. At birth, Joshua tested positive for both cocaine and methadone. In the opinion of one therapist, Susan Nolin, Joshua had one of the worst withdrawals she had ever seen. Nolin is an CT Page 11913 education specialist with Connecticut Children's Medical Center. She is certified in special education and has been a special education teacher for twenty years. She holds a master's degree in education psychology and is associated with the "Birth to Three" Program, a federally funded program for children who have developmental delays or have birth defects such as Down's Syndrome.
On October 7, 1997, because of the respondent's on-going drug usage and mental health issues, DCF filed a neglect petition and obtained an order of temporary custody of Joshua pursuant to General Statutes § 46b-129. Joshua was placed with a foster family. His foster father holds a Masters Degree in social work and is a fifteen year professional employee of the State Department of Mental Retardation.
Joshua's foster parents were immediately concerned about the effects of possible drug exposure on their foster child. Joshua screamed and wailed constantly and was nearly inconsolable. The foster parents stayed awake with Joshua for entire nights, holding and rocking him in a rapid manner until he calmed down. The foster parents also worked with the Birth to Three Program to minimize Joshua's medical and developmental problems.
After Joshua's birth, the respondent lived with various friends. On February 28, 1998, she entered Coventry House, a facility to which she had been referred by DCF. Coventry House offered a year-long structured program. At Coventry House the respondent attended parenting classes and received some individual counseling. She also attended an outside methadone maintenance program.
On March 26, 1998, Joshua was adjudicated a neglected child. Joshua had made progress but still had developmental delays, as summarized in the following Connecticut Children's Medical Center (CCMC) Birth to Three progress note: "At that time concerns were related to overall delays. . . . Joshua did not tolerate being placed in prone and had poor self-regulating abilities. Joshua's birth history is significant for fetal exposure, as well as a suspected hearing loss in his left ear. An evaluation was completed, with additional concerns noted with his reaction to auditory and visual stimulation. Joshua would appear to be accepting of the interactions, but would quickly deteriorate into a more agitated state. He then would be unable to self-soothe, and would become increasingly upset unless held and comforted. Services were started, at a frequency of once per week, at his foster home. Initial goals focused on increasing his ability to tolerate stimulation, while attempting to find cues that he was starting to fall apart. Activities included stretching and movement through a variety of positions."
Between March 1998 and June 1998, CCMC and Coventry House convened CT Page 11914 several meetings and visits at Coventry House with Joshua, his mother, DCF and Joshua's foster parents. The purpose of these meetings and visits was to successfully transition Joshua from his foster home to his mother. The foster parents were very cooperative both before and after Joshua was reunited with his mother. The programs provided by Coventry House and CCMC sought to promote Joshua's development and to equip the respondent with structure, life skills and parenting skills appropriate for a special needs child such as Joshua.
On June 10, 1998, Joshua was placed with the respondent Coventry House. CCMC Birth to Three personnel came one or two times a week to work with the respondent and Coventry House personnel on Joshua's development. Although the respondent was pleased with having her son, she disliked the structure at Coventry House and its work requirements. She felt that the staff was unfair to her.
Susan Nolin of the Birth to Three program made clear to the respondent that she was expected to be present for each one-hour session with Joshua and that she would have to learn to work with Joshua when Nolin was not there. The respondent failed these basic requirements. Sometimes she would fail to attend. The scheduled time for visits was changed to accommodate the respondent's purported needs. Other times she would appear and announce that she would be unable to participate for a reason the Coventry House staff would later find disingenuous. When she did participate in a visit, the respondent would become physically uncomfortable, fidgety, unable to focus and leave. The respondent either failed to nap Joshua sufficiently or would nap him excessively. She also failed to adequately supervise Joshua at Coventry House. This resulted in Coventry House making a report to DCF of suspected child abuse. The report, dated December 1, 1998, stated: "Within the last couple of weeks mother['s] ability to provide adequate care and supervision of her child has continue[d] to decrease. There has been a developing pattern since 11/20/98 to present. At this point we are concerned with her continued difficulty to [meet] this child['s] needs. This morning 11/30/98 it was observed that she did not feed her child breakfast until 10:00 am when child had awaken from 6:30 am."
In meetings with the Coventry House staff and CCMC the respondent would inappropriately animate Joshua, even after she was told not to do so. In meetings with Joshua and Nolin, the respondent would become annoyed and focus on her own needs. She openly stated that she was not doing what the program called for her to do. She failed to provide Joshua with opportunities to move around the facility and failed to have him do required exercises. She thoroughly failed to follow directions or show insight into Joshua's needs. CT Page 11915
Not surprisingly, as a result of the respondent's behavior, Joshua began to lose progress from the gains he had achieved in his foster home. Nolin and Coventry House decided that the respondent would be encouraged to leave Joshua's rehabilitation sessions after twenty minutes and that Coventry House staff would assume the responsibility for helping Joshua attain his developmental goals. Never before had Nolin asked a parent to leave. Thereafter, however, Joshua's progress improved.
In February 1999, Joshua was discharged from the Birth to Three program. He had improved in all areas evaluated and no longer qualified for the program. Indeed, he tested above his age level of 17 1/2 months except for cognitive ability. Because of the respondent's poor parenting skills, Birth to Three recommended that she involve Joshua in the Head Start or Preschool Intervention Program. Although she initially expressed enthusiasm about this opportunity, she failed to enroll Joshua.
In March 1999, the respondent completed the program at Coventry House. She received a certificate of completion from Coventry House for "having fulfilled all requirements of 12 months of residential treatment," and "award of achievement for full participation in activities of the relapse prevention workshop," and an "award of achievement . . . for satisfactory completion of Phase II." Indeed, the respondent had made significant progress in her recovery from substance abuse. However, in a letter to DCF dated March 9, 1999, Coventry House warned that the respondent "needs continued monitoring and supervision to ensure compliance with medication, parenting skills and recovery regimen.
"She is receiving additional services; individual therapy and psychiatric evaluation at the Village for Families Children to address mental illness and domestic violence issues. She is also served by Hartford Dispensary.
"In order for [the respondent] to remain abstinent from substances, and effectively parent Joshua, it is recommended that she continue to attend aftercare at Lifeline, live in a supervised housing program, continue with individual therapy and psychiatric evaluations and attend self-help groups." The respondent, however, did not complete the Lifeline program nor did she successfully complete the other recommended steps.
DCF's plan after the respondent's discharge from Coventry House was to place her and Joshua in another structured setting, to maintain her involvement in the Lifeline Program and to engage the respondent in outpatient counseling. The respondent also was expected to obtain employment. DCF offered to place the respondent in any of several appropriate institutions around the state, where she could be with her son. The respondent, however, insisted that she live in Bristol with her CT Page 11916 mother who, she claimed, was dying and needed her. The respondent's mother, however, reported to DCF that she was in good health.
The respondent finally agreed to enter the Women and Children Transitional Center (WCTC) in Bristol, a transitional structured living program to maintain her abstinence as well as her parenting and social skills. This program was not preferred by DCF but was acceptable to it. The respondent signed two service agreements with DCF and entered the program on March 16, 1999.
The respondent thoroughly failed to abide by her service agreements and was unfavorably discharged from WCTC less than two months later. Between March and May 1999 she was discharged for non-compliance from the Village for Families and Children, where she had received individual counseling for depression; from the Bristol Hospital Parent Aide Program, where she was to learn parenting skills; and from the Lifeline, where she was receiving substance abuse counseling. Around this time the respondent presented a urine sample to the Hartford Dispensary that was not her own. During this time, the respondent also was refusing to take her prescription medication, particularly her psychotropic medication.
During this same time period, Joshua suffered a rapid and dramatic regression due to the respondent's wholesale inability to parent him and care for his special needs. He spoke only five to ten words and rarely combining words. He screamed as a mode of communication. His motor skills, especially his ability to grasp and manipulate objects, had deteriorated, as had his coordination generally.
On May 10, 1999, DCF removed Joshua from the respondent's care. The respondent proposed her own mother as a resource. The respondent's mother, however, was not an appropriate placement because she was an active alcoholic. At the request of DCF, Joshua's previous foster family took him back, returning from an out-of-state vacation to do so. The foster father took time off from work to reintroduce Joshua to the home. The foster family reengaged the Birth to Three program and enrolled Joshua in a day care program. Joshua gradually made progress owing largely to his foster family's extraordinary nurturing, consistency, and special sensitivity to his needs. In February 2000, Joshua was again discharged from the Birth to Three program.
Joshua has remained with his foster family. The respondent has been afforded weekly visitation. She has missed few visits. During visits she is dressed appropriately and behaves appropriately. At times she brings presents, cakes or candy for Joshua.
After May 1999, the respondent intermittently resided with her mother CT Page 11917 or with friends. She did not have steady employment. She never held a job for long. However, she continued on her methadone maintenance program until September 1999 when she relapsed and resumed her use of cocaine.
In September 1999, DCF referred the respondent to Community Mental Health Associations Residential Substance Abuse Treatment Program in New Britain. That month, however, the respondent overdosed on crack cocaine. She was hospitalized at the Institute of Living (IOL) due to this overdose and also because of for major depression. Between September 1999 and March 2000, she tested positive for cocaine at least four times. The respondent was admitted to IOL's Adult Partial Hospital Program where she was expected to attend four groups a day, five times a week. IOL's discharge summary characterized her attendance as only being "fair to poor."
On October 16, 1999, the respondent was arrested for using a motor vehicle without the owner's permission, in violation of General Statutes § 53a-119b. The charge was nolled and the respondent's probation[1]
which she was serving was not terminated. Her life continued to deteriorate and the Hartford Dispensary noted that she was in need of clothing and basic care items.
On November 8, 1999, the respondent's level of care at IOL was decreased to intensive outpatient treatment. She was assigned to three groups a day for three days a week. Again, IOL characterized her attendance as only "fair to poor." However, she resumed her methadone maintenance program and abstained from using illicit drugs. During this time she lived at a domestic violence shelter. On her discharge, IOL recommended that she attend an orientation group for individual therapy and medication management and "to continue to attend 12-step groups and to pursue the Community Renewal Team Program that will assist her with housing."
The respondent chose to live at the Hartford YWCA until February 2000. At that time she moved into her mother's apartment. Her mother, who had been convicted of driving while intoxicated for which she was imprisoned, was no longer occupying the apartment. The respondent represented to DCF that she was a co-lessee on the lease for this apartment, and produced a lease purporting to reflect this. When DCF sought to confirm this information with the lessor, however, it learned that the lease containing the respondent's name was a forgery.
The respondent continued on her methadone maintenance program at The Hartford Dispensary New Britain Clinic. On February 29, 2000, she discussed her relapse triggers with her counselor at Hartford Dispensary. On March 27, 2000, she used cocaine for the last time. CT Page 11918
However, the respondent remained emotionally unstable and generally unable to cope with her problems. She was anxious, depressed, losing weight and unable to pay her bills. She repeated the pattern of obtaining then losing employment. Her psychiatrist at the Hartford Dispensary recommended that she take anti-depressant medication. The respondent resisted at first, believing that this would place her in bad stead with DCF. In November 2000, however, she requested the recommended medication. By November 2000, she had lost another job as a cashier, was unable to find employment and was collecting unemployment compensation. In December 2000, she found another job as a cashier.
With the advent of 2001, the respondent continued to abstain from illicit drugs. Her depression was described as "mild." She wanted to reduce her methadone level because her DCF social worker had stated that this was a goal she should meet before she could be reunified with her son. She did decrease it to 28 milligrams a day, a very low level. The respondent is currently on Step II of Hartford Dispensary's four-step program. She began parenting classes in March 2001. However, she has long resisted participating in group sessions despite the urging of her counselor at the Hartford Dispensary.
On May 9, 2001, the respondent reported to the Hartford Dispensary that she might be pregnant. Two days later she found she was not. Also, at this time, she found another job.
On May 11, 2000, the court (Swienton, J.) found that continued efforts toward reunification were no longer appropriate. On July 13, 2000, DCF filed this petition to terminate the respondent's parental rights. The petition was tried before the court on June 13, 2001, June 14, 2001, July 9, 2001 and July 10, 2001. The court heard eight witnesses and received twenty-six exhibits. The respondent elected not to testify.[2]
The court heard testimony and received reports from Dr. Stephen M. Humphrey, Ph.D., the court-appointed psychologist. On January 22, 2000, Dr. Humphrey performed an assessment of the respondent. He also conducted an interactional study between the respondent and Joshua and between the foster parents and Joshua.
In the interactional study between the respondent and her son, Dr. Humphrey observed that Joshua clearly knew his mother and was comfortable in her presence. "He hugged her spontaneously and vigorously upon seeing her. Joshua seemed fairly content spending time with his mother, although his countenance was subdued and he did not talk much." However, Joshua was unusually clingy and fearful. This, Dr. Humphrey opined, was "a sign not of close emotional bonding, but of insecure attachment. It most CT Page 11919 likely suggests that Joshua has not developed an expectation that [the respondent] will provide consistent care or that she can be relied upon to be available if he needs to return to her as a safe base." (Emphasis in original.)
In his report, Dr. Humphrey observed that in her interaction with Joshua, the respondent "demonstrated the clear capacity to show affection to Joshua in an appropriate and sensitive manner. . . . [S]he seemed very aware of Joshua's qualities with regard to his personality, behaviors, and preferences. . . . There was no indication that [the respondent] is not physically or intellectually capable of providing for Joshua's needs. This capacity may be diminished, however, should she continue to use cocaine and other drugs as she has in the past. . . . [She] has numerous strengths. She presents as [a] fairly intelligent woman who has the capacity to develop positive interpersonal relationships. However, there are clearly ways in which her conduct is not an appropriate model for a child. Abstinence from drugs and appropriate coping in situations that involve stressors such as domestic violence and housing needs should be demonstrated as well. . . . If she is not actively using drugs, there is every indication that [the respondent] would be able to maintain appropriate boundaries with regard to the management of Joshua's behavior." (Emphasis in original.)
Dr. Humphrey opined that "[u]ltimate reunification of Joshua with his mother could be considered with stringent adherence to certain conditions. [The respondent] should show immediate, conclusive evidence that she is addressing her substance abuse problem and other factors by doing the following: a. Maintaining active involvement in substance abuse treatment, minimally weekly outpatient treatment b. Providing physical proof that she has been drug free as determined by random drug testing for a period of six months. (This should occur within the next year if any eventual reunification is to be considered). c. Participation in a parenting skills program and evidence (professional assessment) that she completed the program satisfactorily. d. Regular visitation with Joshua on an ongoing basis (at least weekly). e. No additional criminal charges. f. evidence of a suitable home that she personally rents orowns, or otherwise occupies as the primary resident (e.g., transitional living program, etc.)."
In a supplemental report dated May 18, 2001, Dr. Humphrey related information received from Dr. Strong of the Hartford-New Britain Dispensary: that the respondent had not tested positive for illicit drugs since March 2000, that she is compliant with her drug treatment, that in March 2001 she was employed and showed no evidence of depression, and that, in general, her mental status is stable, and she is working. Dr. Humphrey opined that: "Other than her substance abuse problems, [the CT Page 11920 respondent] has no obvious, diagnosable psychological impediments that would prevent her from implementing appropriate childcare." He then prescribed a five step plan in the event reunification efforts were to take place, in light of Joshua's strong attachment to his foster family.
In his testimony in court, Dr. Humphrey noted that the respondent had admitted to him that she had not completed any programs in the past, and that she had stopped her participation at Coventry House prematurely. The respondent had characterized her own mother as a "lush." The respondent's mother was incarcerated at the time of Dr. Humphrey's interview. The respondent further admitted that she had never had her own apartment and was then living in her mother's apartment. The respondent also stated that she had never had a relationship with an adult male that had not been marked by domestic violence.
"Termination of parental rights means the complete severance by court order of the legal relationship, with all its rights and responsibilities, between the child and the child's parent or parents. . . . Termination of parental rights is a most serious and sensitive judicial action. . . . Since termination of parental rights is the ultimate interference by the state with the natural rights of parents in their children, resulting in everlasting severance of the legal relationship, and usually the permanent separation of parent and child as well, courts must require strict adherence to the statutory standards." (Citations omitted; internal quotation marks omitted.) In re Steven N.,57 Conn. App. 629, 632, 749 A.2d 678 (2000).
In a proceeding to terminate parental rights without a parent's consent, brought pursuant to General Statutes § 17a-112, those statutory standards require that DCF prove three elements by clear and convincing evidence: (1) that DCF "has made reasonable efforts to locate the parent and to reunify the child with the parent, unless the court finds . . . that the parent is unable or unwilling to benefit from reunification efforts provided such finding is not required if the court has determined at a hearing pursuant to subsection (b) of section 17a-110
or section 17a-111b that such efforts are not appropriate," (2) that one or more statutory grounds for termination exist, and (3) that termination of parental rights is in the best interests of the child. General Statutes § 17a-112 (c), now § 17a-112 (j)
"A hearing on a petition to terminate parental rights consists of two phases, adjudication and disposition. . . . In the adjudicatory phase, the trial court determines whether one of the statutory grounds for termination of parental rights exists by clear and convincing evidence. If the trial court determines that a statutory ground for termination exists, it proceeds to the dispositional phase. In the dispositional CT Page 11921 phase, the trial court determines whether termination is in the best interests of the child. . . . It is thus possible for a court to find that a statutory ground for termination of parental rights exists but that it is not in the best interests of the child to terminate the parental relationship, although removal from the custody of the parent may be justified." (Citations omitted; internal quotation marks omitted.) Inre Ashley E., 62 Conn. App. 307, 311-12, 771 A.2d 160, cert. denied,256 Conn. 910, 772 A.2d 601 (2001).
 I
"It is axiomatic that in seeking to terminate parental rights, the commissioner must prove by clear and convincing evidence that the department made reasonable efforts to reunify the parent and child as required by [General Statutes] § 17a-112 (c)(1) [now §17a-12 (j)(1)]. . . . The word reasonable is the linchpin on which the department's efforts in a particular set of circumstances are to be adjudged, using the clear and convincing standard of proof. . . . [R]easonable efforts means doing everything reasonable, not everything possible." (Citations omitted; internal quotation marks omitted.) In re Daniel C., 63 Conn. App. 339, 360-61, ___ A.2d ___ (2001).
As noted supra, on May 11, 2000, the court found that further efforts toward reunification were no longer appropriate. Prior thereto, DCF offered the following services to the respondent: mental health treatment through the Village for Families and Children, Coventry House, IOL, the Bristol Counseling Center, Psychological and Psychiatric Evaluations at the Hartford Dispensary. Parenting training was offered through Lifeline, Coventry house, Klingberg Family Center, the Bristol Hospital Parent Aide program and WCTC. Substance abuse treatment was offered through the Community Substance Abuse Center, Lifeline, IOL, and the Hartford Dispensary. In addition, the respondent was at all times afforded foster care for Joshua, visitation and case management services
By clear and convincing evidence the court finds that DCF used reasonable efforts to reunite the respondent and her son. Indeed, the respondent has not suggested otherwise in evidence or argument.
 II
The ground on which DCF seeks to terminate the respondent's parental rights is her failure to achieve sufficient personal rehabilitation. "Failure of a parent to achieve sufficient personal rehabilitation is one of six statutory grounds on which a court may terminate parental rights pursuant to § 17a-112. General Statutes [(Rev. to 1999) § 17a-112
CT Page 11922 (c)(3)(B) . . . [now (j)(3)(B)]. That ground exists when a parent of a child whom the court has found to be neglected fails to achieve such a degree of rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, the parent could assume a responsible position in the life of that child.
"Personal rehabilitation as used in the statute refers to the restoration of a parent to his or her former constructive and useful role as a parent. . . . [Section 17a-112] requires the trial court to analyze the [parent's] rehabilitative status as it relates to the needs of the particular child, and further, that such rehabilitation must be foreseeable within a reasonable time. . . . [The statute] requires the court to find, by clear and convincing evidence, that the level of rehabilitation [she] has achieved, if any, falls short of that which would reasonably encourage a belief that at some future date [she] can assume a responsible position in [her] child's life. . . . [I]n assessing rehabilitation, the critical issue is not whether the parent has improved [her] ability to manage [her] own life, but rather whether [she] has gained the ability to care for the particular needs of the child at issue. . . ." (Citations omitted; internal quotation marks omitted.) Inre Sheila J., 62 Conn. App. 470, 479-80, 771 A.2d 244 (2001).
"Pursuant to Practice Book § 33-3(a), in deciding the adjudicatory phase of the hearing for the termination of parental rights, the trial court's inquiry is limited to the events and facts preceding the filing of the petition for the termination of parental rights." In re DanielC., supra, 63 Conn. App. 357. However," [i]n the adjudicatory phase, the court may rely on events occurring after the date of the filing of the petition to terminate parental rights when considering the issue of whether the degree of rehabilitation is sufficient to foresee that the parent may resume a useful role in the child's life within a reasonable time." (Emphasis in original.) In re Stanley D., 61 Conn. App. 224, 230,763 A.2d 83 (2000).
As noted supra, on March 26, 1998, Joshua was adjudicated a neglected child. As of July 13, 2000, the adjudicatory date, the respondent had neither significantly improved her ability to manage her own life nor gained the ability to care for Joshua's particular needs. First, she had been abstinent from drugs for less than four months. Especially in view of her many years of alcohol and drug abuse, such a relatively short period of abstinence did not evidence that she had achieved significant control of her addiction.
Second, her life was chaotic and unstable. After leaving Coventry House, she was unfavorably discharged from WCTC and other services provided to her. Both at Coventry House and WCTC, the respondent exhibited CT Page 11923 a poor attitude. The discharge summary from WCTC states that the respondent "had repeated rule violations for not completing her chores, coming in past curfew, and leaving the facility to an unapproved destination and/or without a pass. Melanie was put on probation twice and issued several warnings due to her behavior. Melanie displayed an attitude of indifference to these consequences. Melanie was able to make a few steps forward. She began to make plans for her future. She had set goals of completing employment training at the bureau of Rehabilitation Services, getting her license back, and obtaining a suitable home for herself and Joshua. Melanie was unable to meet these goals. . . .
"Melanie was put on probation and several interventions were taken to help [her] maintain in the program, however she did not comply. Her attendance at Life Line began to be sporadic and she continued to leave the facility without a pass. Melanie did not follow through on her contractual action plan. For [e]xample: she was required to attend three Alcoholic Anonymous or Narcotics Anonymous meetings per week, attend Life Line, and follow through with her DCF contact. Melanie posed many problems for the staff as well as the other residents. Her negative attitude towards rules made her disruptive to the program. . . .
"Melanie refused any referrals to shelters, temporary housing or programs." Thereafter, the respondent became involved with a relationship that was marked by domestic violence. She overdosed on cocaine in an apparent suicide attempt, for which she was hospitalized at IOL. Thereafter, the respondent never obtained her own apartment, was unable to pay her bills or hold a job for very long. She continued to suffer from depression.
Third, despite her receipt of a certificate of completion and awards of achievement from Coventry House, accolades that reflected hope over experience, the respondent was woefully incapable of caring for a child of Joshua's young age and specialized needs. Coventry House repeatedly reported to DCF about the respondent's failure to provide adequate supervision of Joshua, her poor parenting of him ("Mother is sleeping all the time, not feeding Joshua on time, is late to group meetings and continues to blame everyone else." Ex. 9), and her repeated violation of House policies. The respondent later admitted that she violated the rules of Coventry House, stating to Dr. Stephen Humphrey: "I wasn't following the rules, but it's not like I was breaking the law. I was living my life the way I was used to living it." Although the respondent was provided with a structured environment and support services at Coventry House, as well as WCTC, her son's well being suffered when his care depended primarily on his mother's conscientiousness.
As of the adjudicatory date, moreover, there was no reason to believe CT Page 11924 that, within a reasonable period of time, the respondent could assume a responsible position in Joshua's life.
By clear and convincing evidence, the court finds that as of the adjudicatory date, the respondent failed to achieve such a degree of rehabilitation as would encourage the belief that within a reasonable time, considering Joshua's age and needs, she could assume a responsible position in the life of her son.
 III A. Mandatory Findings
"In the dispositional phase of a termination of parental rights hearing, the trial court must determine whether it is established by clear and convincing evidence that the continuation of the parents' parental rights is not in the best interests of the child." (Internal quotation marks omitted.) In re Ashley E., supra, 62 Conn. App. 315. "In arriving at that decision, the court is mandated to consider and make written findings regarding seven factors delineated in General Statutes [(Rev. to 1999) § 17a-112 (d) [now § 17a-112 (k)]." (Internal quotation marks omitted.) In re Deana E., 61 Conn. App. 185, 190,763 A.2d 37 (2000).
1. Finding regarding the timeliness, nature and extent of servicesoffered, provided, and made available to the parent and the child by achild-placing agency to facilitate the reunion of the child with theparent.
As noted supra, on May 11, 2000, the court found that further efforts toward reunification were no longer appropriate. Prior thereto, DCF timely offered the following services to the respondent: mental health treatment through the Village for Families and Children, Coventry House, IOL, the Bristol Counseling Center, Psychological and Psychiatric Evaluations at the Hartford Dispensary. Parenting training was offered through Lifeline, Coventry House, Klingberg Family Center, the Bristol Hospital Parent Aide program and WCTC. Substance abuse treatment was offered through the Community Substance Abuse Center, Lifeline, IOL, and the Hartford Dispensary. In addition, the respondent was at all times afforded foster care for Joshua, visitation and case management services.
2. Finding regarding whether DCF has made reasonable efforts to reunitethe family pursuant to the Federal Child Welfare Act of 1980, asCT Page 11925amended.
The court finds that DCF made reasonable efforts to reunite the respondent with her son.
3. Finding regarding the terms of any applicable court order enteredinto and agreed upon by any individual or child-placing agency and theparent, and the extent to which all parties have fulfilled theirobligations under such order.
On March 26, 1998, the court (Quinn, J.) issued the following expectations to the respondent:
*Keep all appointments set by or with DCF, keep whereabouts known to DCF or your attorney. Except for brief periods, the respondent has substantially complied with this expectation.
*Visit the child as often as DCF permits. The respondent complied with this expectation.
*Participate in parenting counseling at IOL, individual counseling, and drug and alcohol counseling, including drug testing at the Hartford Dispensary, following all treatment recommendations. The respondent has participated with drug testing at the Hartford Dispensary. However, although the respondent may have "participated" in parenting counseling at IOL, her participation in all of IOL's groups was, as characterized by IOL, only "fair to poor." Although the Hartford Dispensary has repeatedly urged her to attend weekly support groups, the respondent has failed to do so.
*Secure and maintain adequate housing and income. Since Joshua was adjudicated neglected, the respondent has never had her own dwelling. At the time of trial, she lived in her mother's apartment. Although there is no evidence that the apartment itself is inadequate, it is significant that it is not her apartment. She is not the lessee. She could be dispossessed of the apartment by her mother at any time, pursuant to General Statutes § 47a-23. She could be evicted by the lessor, pursuant to that statute, should her mother materially breach the terms of the lease.
Although the respondent has had several jobs since 1999, she has been unable to maintain them. She has had difficulty paying her bills. She has, therefore, not maintained adequate income.
*Do not engage in substance abuse. The respondent resumed her illicit use of drugs in the latter part of 1999 and continued until March 2000 CT Page 11926 when she stopped.
*Have no involvement with the criminal justice system. DCF has failed to prove that the respondent violated this expectation.
*Continue with: treatment at the Hartford Dispensary, counseling at IOL; parenting classes and random drug screens. The respondent's degree of engagement with IOL's services is discussed supra. DCF has not proven that the respondent failed to comply with this expectation. It is noteworthy that while DCF referred the respondent to a parenting program in Bristol, the respondent refused to go, protesting that she had taken parenting classes at Coventry House. Although the record does not contain other evidence that the respondent completed a course in parenting, the DCF social worker did not ascertain if the respondent's claim was true.
4. Finding regarding the feelings and emotional ties of the child withrespect to the child's parents, any guardian of the child's person andany person who has exercised physical care, custody or control of thechild for at least one year and with whom the child has developedsignificant emotional ties.
After the respondent's unfavorable discharge from WCTC, she did not visit Joshua for several months, apparently due to the chaotic nature of her life. When she began weekly visits in November 1999, Joshua did not know her and did not react well to her. He did not want to be in the same room with her and did not separate easily from his foster parents. By early 2000, however, Joshua had become reacquainted with the respondent. He was more willing to attend visits and there was some physical affection between mother and son. However, Joshua does not refer to the respondent as his "mother" nor is she, in fact, his psychological parent.[3] It is clear, however, that she loves him very much and expresses this to him, verbally and non-verbally, in their visits.
Joshua has a warm and loving relationship with his foster parents to whom he refers as "mommy" and "daddy." They are clearly his psychological parents.
5. Finding regarding the age of the child.
Joshua is now 3 1/2 years of age. He will be four on September 2001.
6. Finding regarding the efforts the parent has made to adjust suchparent's circumstances, conduct or conditions to make it in the bestinterest of the child to return the child to the parent's home in theforeseeable future, including, but not limited to: (A) the extent toCT Page 11927which the parent has maintained contact with the child as part of aneffort to reunite the child with the parent; provided the court may giveweight to incidental visitations, communications or contributions, and(B) the maintenance of regular contact or communication with the guardianor other custodian of he child.
The respondent has been fairly consistent in visiting Joshua. In addition, she has made significant progress in controlling her drug addiction. The Hartford Dispensary reports that, for over a year, the respondent has been compliant with methadone maintenance and has tested negative for all substances other than methadone. Moreover, the respondent's depression has abated since the end of 2000.
However, the respondent's behavior, as manifested at Coventry House and WCTC, is irresponsible and erratic. She does not lead a structured life and resists the imposition of structure on her life. She lacks insight into the effect her behavior has on her son's welfare. Such deficiencies threaten the health and safety of a special needs child such as Joshua. Indeed, the respondent has stated that she does not think Joshua has any special needs. Compare In re Steven N., 57 Conn. App. 629, 634, 749 A.2d 678
(2000) (respondent unable to comprehend or provide for her children's special needs); In re Shyliesh H., 56 Conn. App. 167, 174, 743 A.2d 165
(1999) (respondent testified at trial he was unaware of child's special needs, including her developmental delays.); In re Amber B.,56 Conn. App. 776, 782, 746 A.2d 222 (2000) (respondent had no understanding of child's special needs.) It is true that, in his psychological evaluation, Dr. Humphrey opined that "[i]f she is not actively using drugs, there is every indication that [the respondent] would be able to maintain appropriate boundaries with regard to management of Joshua's behavior." For reasons discussed throughout this memorandum, however, the court flatly disagrees with this opinion. Similarly, the court questions Dr. Humphrey's opinion that "[t]he primarypsychological obstacle to effective parenting ability in [the respondent's] case is her history of substance abuse." (Emphasis in original) While the psychological testimony from professionals is rightly accorded great weight in termination proceedings, the court is not bound by, and is free to judge the credibility of all witnesses, including expert witnesses. In re Savanna M., 55 Conn. App. 807, 816, 740 A.2d 484
(1999); In re Kezia M., 33 Conn. App. 12, 22-23, 632 A.2d 1122, cert. denied, 228 Conn. 915, 636 A.2d 847 (1993).
Moreover, as observed supra, the respondent has not obtained her own apartment. She was living in the apartment of her mother. Because of her own active alcoholism and irresponsible behavior, her mother was not an appropriate person with whom Joshua could live.[4] While the respondent's mother was incarcerated at the time of trial, the respondent CT Page 11928 represented in closing argument that she had been or was being released. Finally, the respondent had shown a consistent pattern of being unable to maintain employment and, therefore, to maintain an income from which she could support herself and a child.
7. Finding regarding the extent to which a parent has been preventedfrom maintaining a meaningful relationship with the child by theunreasonable act or conduct of the other parent of the child, or theunreasonable act of any other person or by the economic circumstances ofthe parent.
The respondent has not been prevented from maintaining a meaningful relationship with Joshua by the unreasonable act or conduct of Joshua's father, or the unreasonable act of any other person or by her economic circumstances.
 B.
Although in determining whether to grant a petition to terminate parental rights the court is statutorily mandated to consider seven factors; General Statutes (Rev. 1999) § 17a-112 (d) now § 17a-112
(k); In re Tyscheicka H., 61 Conn. App. 19, 26, 762 A.2d 916 (2000); "[t]he trial court is vested with broad discretion in determining what is in the child's best interests. . . . Conducting a best interest analysis is . . . purposefully broad to enable the trial court to exercise its discretion based upon a host of considerations." (Citations omitted; internal quotation marks omitted.) In re Alissa N., 56 Conn. App. 203,208, 742 A.2d 415 (1999), cert. denied, 252 Conn. 932, 746 A.2d 791
(2000). Notably, General Statutes (Rev. 1999) § 17a-112 (i), now § 17a-112 (p), expressly provides that its provisions "shall be liberally construed in the best interests of any child for whom a petition under this section has been filed." "The best interests of the child include the child's interests in sustained growth, development, well-being, and continuity and stability of its environment." (Internal quotation marks omitted.) In re Shyina B., 58 Conn. App. 159, 167,752 A.2d 1139 (2000).
The respondent understandably places great emphasis on the opinion of Dr. Humphrey that "[u]ltimate reunification of Joshua with his mother could be considered with stringent adherence to certain conditions."[5]
The court disagrees that this opinion of Dr. Humphrey militates in favor of denying the petition.
First, Dr. Humphrey did not opine that it would be in Joshua's best interests to be reunited with his mother, only that such reunification "could be considered." Notably, in his report, Dr. Humphrey also CT Page 11929 observed: "It is clear that Joshua could adapt quite readily to adoption by [his foster parents]. It is not clear what the psychological effects of a transition to his mother would be." This is a far cry from an endorsement of reunification as being in the child's best interests. Second, Dr. Humphrey's data base was severely restricted. The only documents provided to him were the summary of adjudicatory facts for termination of parental rights and the study in support of termination of parental rights. He spoke only with the respondent, Joshua and the foster parents on a single day.[6] He did not have the benefit of the several exhibits received by the court — particularly records of Covenant House and WCTC — nor the opportunity to hear witnesses. Third, his report reflected an inadequate appreciation of just how unstable, erratic and irresponsible the respondent's proven behavior is. She can barely care for herself and clearly cannot care for a special needs child such as Joshua. Joshua developmentally plummeted when left to the respondent's care in 1999. No doubt, he would again. Fourth, although Dr. Humphrey observed that the respondent "presents as [a] fairly intelligent woman who has the capacity to develop positive interpersonal relationships," it is significant that there is no evidence that she has ever realized that capacity. There is no hint in the record that she has ever had a "positive relationship." Fifth, Dr. Humphrey was markedly more guarded in suggesting reunification in his testimony, in which he noted the respondent's lack of insight as to how her own problems and behavior affected her son.
The respondent nonetheless argues that she is now on the "upswing," having abstained from illicit drugs since March 2000. She pleads more time to prove her recovery. However, her parenting deficiencies go well beyond drug abuse and render her incapable of parenting a child, especially a special needs child such as Joshua, within the foreseeable future.
Joshua, whose life began so inauspiciously, is uniquely fortunate to have come into the care of his foster parents. They have cared for him for three of his four years. They clearly have sophistication in parenting generally and in parenting a special needs child such as Joshua, who they aptly characterize as a "high maintenance" child. They have undergone enormous sacrifice for Joshua's welfare[7] and he has flourished in their care. The foster parents have integrated Joshua into their family and there is an abundance of mutual love and bonding between them. The foster father has testified, and the court finds, that the foster parents will adopt Joshua should he be freed for adoption. Rarely does a special needs child find such special parents.
Because of Joshua's age and special needs, the respondent's demonstrated inability to meet those needs and the extraordinary CT Page 11930 capabilities of his foster parents, Joshua's interests in sustained growth, development, well-being, and continuity and stability of its environment are best served by the termination of the respondent's parental rights and adoption by his foster parents. See., e.g., In re EdenF., 250 Conn. 674, 710, 741 A.2d 873, rearg. denied, 251 Conn. 924,742 A.2d 364 (1999). By clear and convincing evidence the court finds that it is in Joshua's best interests that the respondent's parental rights be terminated.
 IV
The petition is granted. The court terminates the respondent's parental rights. The Commissioner of the Department of Children and Families is appointed statutory parent for Joshua for the purpose of securing a permanent adoptive family for him. Joshua's foster parents shall be afforded the first opportunity to adopt him. The commissioner shall file with this court no later than 90 days following the date of this judgment a written report of efforts to effect such permanent placement and file further reports as are required by state and federal law
Dated at Middletown this 28th day of August, 2001.
BY THE COURT
Bruce L. LevinJudge of the Superior Court