Memorandum of Decision
On July 24, 2000, the Department of Children and Families (hereinafter CT Page 11851 "DCF" or the "petitioner") filed a petition to terminate the parental rights of Victoria T.-C. and Hector Luis C.-R. to their child Adelaida C.-T., born July 1993. Victoria T.-C., the respondent mother, was served with the petition and has participated throughout the course of the proceedings. After this action was commenced, investigation disclosed that Hector Luis C.-R., the respondent father, whose whereabouts had been unknown for an extended period prior to the filing of the petition, had died on September 28, 1999.
Victoria T.-C. (hereinafter the "respondent") opposed the termination of her parental rights. The statutory ground alleged in the petition for the termination of parental rights as to the respondent was that Adelaida had previously been found to have been neglected, and that the respondent had failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, the respondent could assume a responsible position in the life of the child. C.G.S. § 17a-112(c)(3)(B).[2]
The matter was tried to the court on May 14, 2001 and June 1, 2001. The respondent appeared at trial with counsel, and was assisted as well by a guardian ad litem. Also present was counsel for the petitioner and counsel for the minor child. All counsel, including the respondent's guardian ad litem, who was himself an attorney, participated fully in the examination of witnesses and in the presentation of closing arguments. The evidence consisted of the testimony and reports of (1) Dr. Ines Schroeder, a licensed psychologist appointed by the court to evaluate the emotional and psychological state of the respondent, Adelaida, and Rosa A., Adelaida's current foster mother; (2) Mr. Frederick Lanz, a licensed child therapist who has treated Adelaida since February, 2001; and (3) Ms. Melanie Mercado, the DCF social worker involved with this family since August, 2000.[3]
The court finds that it has proper jurisdiction of the matter, and that there is no pending action affecting the custody of the minor child. The court has carefully considered the petition, all of the evidence and testimony presented and the arguments of counsel, according to the standards required by law. On the basis of the evidence presented and for the reasons stated below, the court finds in favor of the petitioner and hereby terminates the parental rights of the respondent.
 I. Facts
The court finds the following facts to have been proven by clear and convincing evidence:
A. Procedural History
CT Page 11852
Adelaida was born on July 1993 and is now eight years old. She is the youngest of respondent's five children. On October 14, 1998, DCF filed a neglect petition alleging that Adelaida and three of her siblings were neglected.[4] As to Adelaida, the petition alleged that she was neglected in that she was being denied proper care and attention. On May 17, 1999, the court, Goldstein, J., adjudicated Adelaida neglected and committed her to the care and custody of DCF.[5] The court, Goldstein,J., extended this commitment for an additional twelve months on April 13, 2000, and found, after hearing, that continued efforts to reunify the child with the respondent were no longer appropriate. On July 24, 2000, during the pendency of this commitment, DCF filed the instant petition seeking to terminate the parental rights of the respondent as to her daughter, Adelaida. On March 22, 2001, Adelaida's commitment was extended for a further twelve-month period by the court, Goldstein, J., at which time the court again found, after a proper hearing, that continued efforts to reunify Adelaida with the respondent were not appropriate.
B. The Respondent
The respondent has a ten-year history of mental illness, which has been marked by almost daily auditory hallucinations, and which has resulted in at least three suicide attempts and multiple hospitalizations. She has been diagnosed with major depression, schizophrenia with psychotic features or, more generally, a schizo-affective disorder. Her condition has been described as chronic and debilitating, and there exists a very poor prognosis for any future improvement.
Although she has suffered from symptoms of mental illness since 1991, respondent's condition deteriorated quite markedly in the spring of 1997. In March of 1997, she was admitted to the psychiatric unit of a local hospital in Meriden after she attempted suicide by drug overdose while in her home. The evidence suggests that Adelaida, who was three years old at the time, was alone with her mother in the home at the time her mother overdosed. During the course of this hospitalization, the respondent noted that her symptoms had become exacerbated and that she had been and was experiencing auditory hallucinations telling her to hurt herself and her children.
In July of 1997, the respondent again attempted suicide — this time by cutting herself — apparently again in the presence of then four year old Adelaida. Upon her discharge from this hospitalization, the respondent only sporadically participated in recommended mental health treatment and wholly failed to follow through on the services that were being provided. The respondent entered into a voluntary service agreement with DCF on June 10, 1998, but she failed to abide by the terms of the CT Page 11853 agreement. In September, 1998, the respondent, by her own report, had become noncompliant with her own medications and had begun again to experience suicide ideation and increased auditory hallucinations. The deterioration in her condition was at least partially responsible for the hospitalization of two of Adelaida's siblings, Eva and Juan, both of whom, given their mother's inattentiveness, had themselves become noncompliant with their own medication requirements.[6]
Even after the neglect petition was filed on October 14, 1998, the respondent still failed to avail herself fully of the services being provided to her by DCF. According to health care personnel then providing in-home services, the respondent's ability to parent her children was impaired due to her depression, disorganization and limited cognitive abilities. On December 2, 1998, the court granted an Order of Temporary Custody on behalf of Adelaida's sister, Eva. Even with the removal of one of her daughters from the home, the respondent continued to be largely noncompliant with the recommendations of her service providers.[7]
On May 17, 1999, as noted above, Adelaida was adjudicated neglected and was committed to the care and custody of DCF.[8] On that date, the respondent executed and the court ordered "specific steps," which included, among other provisions, the expectation that she would (1) keep her appointments with DCF, (2) participate in individual, family and parenting counseling, (3) ensure that her own mental health needs, and those of her children, were met, and (4) follow the recommendations of all service providers and take any and all medications as prescribed.
Consistent with these expectations, DCF offered appropriate services to the respondent, which afforded her the opportunity to be rehabilitated and to be reunified with Adelaida. To this end, DCF directly provided case management and transportation services, established a reasonable visitation schedule, made referrals for individual and family therapy, intensive family preservation counseling and parent aide services, and arranged for necessary psychiatric evaluations to be prepared. DCF also made available to the respondent the services of numerous independent care providers, including the Visiting Nurse Association (in-home services to assist in ensuring respondent's medication compliance), Child Guidance Clinic for Central Connecticut, Inc. (instruction in parenting and in providing a safe home environment), Community Provider Consortium Respite Program (mentoring for the child and an opportunity for the respondent to be temporarily relieved of parenting responsibilities), Midstate Hospital and Veteran's Memorial Medical Center (individual and group therapy and behavioral health treatment, both in-patient and within the Latino Program and the Women's Support Group), Milford Mental Health Center (intensive family preservation counseling and in-home therapeutic services), Catholic Family Services (parenting classes), and Lake Grove CT Page 11854 Center (family counseling).
Notwithstanding these extensive and appropriate efforts, the respondent, based on all accounts, continues and will continue to manifest psychotic symptoms and experience psychotic episodes. Even with all the support she has received, she readily reports that she continues to hear command hallucinations every day. Because of her difficulty in correctly perceiving reality, she often lacks common sense and the capacity to make appropriate judgments when the best interests of her children are at stake. Her clinicians share the opinion that, even with future treatment, she will experience little, if any, improvement in her overall condition. As a result, these experts have concluded that the respondent will not be able to assume the responsibility of caring for Adelaida.
C. Adelaida
Adelaida is an eight year old child who was committed to DCF on May 17, 1999 and has been in foster care since that date. Her initial foster placement was terminated after only ten days, when her behavior became too much for the foster mother to handle. In March, 2000, while in a second placement, Adelaida began to experience severe emotional distress both at home and in school. On April 4, 2000, Adelaida was taken to the emergency room after she stated that she wanted to die. Since that date, she has received counseling from various providers who have diagnosed her as suffering from an Adjustment Disorder with Mixed Disturbances of Emotion and Conduct.
Adelaida's current placement — her third — commenced November 24, 2000 and has to date been quite successful. She has adjusted well to her new foster home and Adelaida often states that she loves her foster mother. The foster mother reports that she and Adelaida have processed the issues between them easily and with success. In school, Adelaida has been transitioned from special education to regular education. Also, since Adelaida started working with Mr. Lanz, her behavioral problems in school have significantly decreased and she is now beginning to form appropriate peer relationships with fellow students. In the opinion of Mr. Lanz, these great strides that Adelaida has made are a direct result of the care and attention she has received in her current foster home environment.
This opinion echoes that of Dr. Schroeder, who characterizes the relationship between Adelaida and her foster mother as "harmonious and comfortable." Adelaida looks to her foster mother for help and to leam, and there exists a great sense of trust between the two. By all accounts, Adelaida's foster mother appears to be her "psychological CT Page 11855 parent" at this time — the person Adelaida turns to for individual attention, and for care and guidance.
 II. Adjudicatory Findings
During the adjudicatory phase of a hearing on a petition to terminate parental rights, the trial court, applying a clear and convincing evidence standard, must determine first, whether DCF has made reasonable efforts to reunify the child with the parent, and second, whether one or more of the four grounds for termination of parental rights set forth in C.G.S. § 17a-112(c) exists. In this phase of the hearing, the court, pursuant to Connecticut Practice Book § 33-3(a), is ordinarily limited to consideration of those events which preceded the date of the filing of the petition or its latest amendment.[9] Therefore, the adjudicatory date for this matter is July 24, 2000, the date upon which the petition was filed.
A. Efforts to reunify
In order to terminate parental rights, DCF must initially show by clear and convincing evidence that it "has made reasonable efforts to locate the parent and to reunify the child with the parent unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts . . . providing that this finding is not required if the court has determined at a hearing . . . that such efforts are not appropriate. C.G.S. § 17a-112(c)(1). Here, DCF has met its burden by showing that there were reasonable efforts made to reunify Adelaida with the respondent. As has been often stated, "reasonable efforts means doing everything reasonable, not everything possible." Inre Savanna M., 55 Conn. App. 807, 812 (1999). Dr. Schroeder's uncontroverted testimony established that the services offered by DCF were appropriate to the respondent's needs, and offered the respondent the type of treatment and services necessary to address these needs to the degree necessary for her to be reunified with Adelaida.[10]
B. Statutory grounds — "Failure to rehabilitate"
To prevail in a non-consensual termination of parental rights, DCF must also prove by clear and convincing evidence that one of several statutory grounds for termination exists. In its petition and at trial, DCF has alleged the ground of "failure to rehabilitate," as is defined in C.G.S. § 17a-112(c)(3)(B)(1). This statutory ground for termination arises when "the parent of a child who has been found by the Superior Court to have been neglected or uncared for in a prior proceeding . . . has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age CT Page 11856 and needs of the child, such parent could assume a responsible position in the life of the child." C.G.S. § 17a-112(c)(3)(B)(1). With respect to this statutory ground for termination of parental rights, the court, having considered the evidence within the time periods permitted by law, finds that the petitioner has met its burden of proof Accordingly, the court resolves this issue in favor of the petitioner.
The first part of the statute is satisfied by virtue of the fact that, on May 17, 1999, the court, Goldstein, J., found Adelaida to have been neglected. The remainder of the statute requires the court to determine whether the facts encourage the belief that the parent could assume a responsible position in the child's life. This task requires the court to analyze a parent's rehabilitation "as it relates to the needs of the particular child" and to determine whether such rehabilitation is foreseeable "within a reasonable time." In re Luis C., 210 Conn. 157, 167
(1989). In this assessment, "the critical issue is not whether the parent has improved her ability to manage her own life, but rather whether she has gained the ability to care for the particular needs of the child at issue." In re Shyliesh H., 56 Conn. App. 167, 180 (1999).[11]
Based upon the clear and convincing evidence presented at trial, the court finds that the respondent has failed to gain the ability to parent Adelaida, and further, that it is not foreseeable that the respondent will achieve the necessary level of rehabilitation in the foreseeable future. The respondent's failure to achieve rehabilitation stemmed from a number of factors, many of which suggest that the respondent, at certain times, was not fully committed to the goal of rehabilitation. For example, the respondent repeatedly failed to meet the court-ordered expectations set forth prior to and at the time of the neglect adjudication. With regard to her obligation to keep DCF appointments, the respondent was initially noncompliant and failed to attend a series of appointments between September 2, 1999 and February 22, 2000. The respondent was referred for parenting classes at Catholic Family Services in July, 1999, and, despite the agency's frequent attempts to contact her, the respondent never appeared. Similar efforts to provide family counseling proved equally unavailing due to the respondent's chronic nonattendance. Even where the respondent did attempt to take advantage of services, for instance at the Latino Program at Midstate Hospital, her clinicians reported that no significant progress was ever achieved.
The court also notes that the respondent has been noncompliant with her prescribed medication requirements, having often failed to take her medication at the proper times and in the proper dosages. Indeed, only with a personal visit from a treatment provider two or more times daily has the respondent regularly taken her medication as prescribed. According to treatment providers, this noncompliance with her medication CT Page 11857 requirements could have devastating consequences in that the respondent may decompensate quickly and possibly become a threat to herself or others.
Moreover, experts agree that the respondent's condition is chronic and resistant to treatment, and its symptoms will continue to plague the respondent for the foreseeable future. The experts also concur in the opinion that the condition is one that is exacerbated by stress, including the stress so obviously associated with parenting. In this regard, the respondent has stated not only that anxiety and stress cause her auditory hallucinations to become worse, but more disturbingly, that she "liked to have her children around because it helped to distract her from the voices." These hallucinations have occurred frequently enough to even be recognized by Adelaida, who has described her mother as getting "confused" and having "different kinds of stuff in her head [so that she] can't help us when stuff happens."
While the respondent has taken steps toward rehabilitation, and perhaps has made some modest progress to that end, the evidence clearly and convincingly establishes that she cannot now, nor in the foreseeable future, safely parent Adelaida, a child who has significant specialized needs of her own. Sadly, the respondent's deficiencies, "even though involving no fault, [are] so great as to render [her] incapable of measuring up to the child's needs." In re Jessica S., 51 Conn. App. 667,673 (1997). Most treatment has provided the respondent with at best a "one step forward, two steps back" type of success. To the extent that the respondent has made efforts to modify her life in a positive fashion, these efforts have brought about only a minimal, and often only a temporary, improvement. The respondent continues today to experience psychotic episodes and an impairment of judgment and common sense, even during periods when she is actively involved in treatment and is generally compliant with her medication requirements.
The expert psychological testimony presented in this case — testimony which "is rightly accorded great weight," In re Eden F.,250 Conn. 674, 707 (1999) — demonstrates that the respondent's mental illness, coupled with her significant cognitive limitations, have crippled, and will always cripple, her ability to raise this child.[12]
Simply put, "in light of the serious and chronic nature of [the respondent's] mental illness, her future prospects for assuming a responsible parenting role for her [child] are bleak." Id. The court therefore finds by clear and convincing evidence that the respondent has failed to achieve such a degree of rehabilitation that would likely enable her to assume a responsible parenting position for Adelaida within a reasonably foreseeable time. Accordingly, the petitioner has satisfied its burden of proof on the ground of parental failure to rehabilitate. CT Page 11858 C.G.S. § 17a-112 (c)(3)(B).
 III. Disposition
A. Required Statutory Findings
The court makes the following factual findings, on the basis of clear and convincing evidence, as required by C.G.S. § 17a-112 (d):
1. Timeliness, nature and extent of services
The court finds by clear and convincing evidence that the following appropriate and timely services have been made available by DCF to facilitate the reunion of Adelaida with the respondent: case management services, transportation, visitation, referrals for individual and family therapy, intensive family preservation services, parent aide services, psychiatric evaluations, Visiting Nurse Association services, Child Guidance Clinic for Central Connecticut, Inc. (parent aide), Community Provider Consortium Respite Program, Midstate Hospital and Veteran's Memorial Medical Center (Latino Program, Women's Support Group, inpatient psychiatric counseling), Milford Mental Health Center (Intensive Family Preservation Program), Catholic Family Services (parenting classes), and Lake Grove Center (family counseling).[13]
2. Reasonable efforts at reunification pursuant to federal law
The court finds that DCF made reasonable efforts to reunify Adelaida with the respondent, given the situation and circumstances presented. The court finds that DCF has provided the services as described above, and that these services afforded the respondent a reasonable opportunity to achieve the degree of rehabilitation necessary for her to be reunified with Adelaida. Notwithstanding these reasonable efforts, reunification ultimately was not possible, for the reasons stated herein.[14]
3. Compliance with court orders
Reasonable court expectations were set for the respondent on at least two occasions, but she has failed to meet many of these expectations. While the respondent has complied with these orders in some respects, the clear and convincing evidence demonstrates that she: 1) has failed to accept or consistently participate in many of services made available to her, 2) has not fully and adequately cooperated with her own treatment and service providers, 3) has not properly managed her own medication requirements, and 4) has not developed the tools necessary for her to interact with and assume parental responsibility for Adelaida. CT Page 11859
4. Feelings and emotional ties of the child
Although loving her mother and at times expressing a desire to stay with her, Adelaida constantly fears the ways in which her mother's mental illness may manifest itself Adelaida does not look for guidance from her mother, and often seems confused by her mother's gestures of affection. Supervised visits were incident-free, but Adelaida remains guarded and hesitant around her mother, and expresses feelings of guilt and anxiety after the visits. of particular note is the fact that the child, due to her mother's limitations and illness, is forced to assume the role of caretaker and to act as "parent" for her mother — an unhealthy role which prevents Adelaida from developing personal and interactional skills and from experiencing the feelings of safety and support which a child needs to receive from a parent.
The court also finds by clear and convincing evidence that Adelaida has developed strong emotional ties with her foster mother. Adelaida is very comfortable in the foster home, and has established a positive and close bond with the foster mother. Adelaida has a stronger and greater sense of trust with her foster mother than with the respondent.
5. Age of the child
Adelaida is eight years old.
6. Efforts made by the parent to adjust
There is clear and convincing evidence that the respondent either has been unwilling or unable to adjust her circumstances to make it in the best interest of Adelaida to return to the respondent's home in the foreseeable future. In part, the respondent has refused to make such efforts, i.e. by failing to attend to certain of her own treatment needs. In other respects, the respondent has been unable to benefit from the services being offered. Even with treatment, the respondent's chronic illness prevents her from adjusting her condition and circumstances sufficiently to make it in Adelaida's best interest to return home.
7. Extent to which parent was prevented from having a meaningfulrelationship
DCF has taken many steps to foster Adelaida's relationship with the respondent, and has engaged in no unreasonable conduct which interfered with that relationship. The respondent has not been prevented, by any person, state agency, economic condition or by any other extrinsic factor, from maintaining a meaningful relationship with her child. CT Page 11860
B. Best Interests of the Child
The court is next called upon to determine whether termination of the respondent's parental rights is in the best interests of Adelaida. The question to be decided in this dispositional phase "is whether it is in the best interests of the child to sever the parent-child relationship."In re Carissa K., 55 Conn. App. 768, 776 (1999). "The best interests of the child include the child's interests in sustained growth, development, well-being, and continuity and stability of its environment." In re Shyina B., 58 Conn. App. 159, 167 (2000). In this regard, there is no question but that "long-term stability is critical to a child's future health and development." In re Eden F., 250 Conn. 674,709 (1999).
The court finds, based on the clear and convincing evidence presented at trial, that Adelaida requires a stable placement and permanency, as well as a timely closure of the issues related to whether or not her biological mother will be able to assume parental responsibilities. The court also finds, by this same standard of proof, that these interests will best be served by terminating the respondent's parental rights as to Adelaida.
Although the respondent and Adelaida have a strong attachment, the court questions whether this relationship provides any real benefit to the child. According to the professionals who have evaluated the relationship, Adelaida's ability to develop personal and interactional skills is hampered by her contact with her mother. Adelaida does not feel safe or secure in the presence of her mother, and knows full well to look elsewhere for guidance and stability. Importantly, Dr. Schroeder noted that, in this relationship between mother and child, it is the child, Adelaida, who has been forced to assume the role of the parent. While supervised visits between them went generally well, Adelaida, consistent with this role-reversal, did not look for guidance from her mother, but instead tried to provide it. She also seemed confused at times by her mother's gestures of affection. The testimony is uncontroverted that this "parentization" of a child can retard a child's development of personal and interactional skills — a limitation which therapists have noted in their assessment of Adelaida.
Compounding the problem here is the fact that although Adelaida is old enough to understand that her mother suffers from some sort of illness, she is clearly frightened by the nature of that illness and its effects. So not only does Adelaida take on the role of caretaker, she does so while at the same time questioning her own safety and well-being, always wondering when her mother's next psychotic break may occur. Given this confusion and these fears, it is not at all surprising that the testimony CT Page 11861 described Adelaida as appearing edgy, nervous and anxious after her visits with the respondent.
Contrasted with this unhealthy relationship is the extraordinarily beneficial relationship Adelaida has formed with her current foster mother. As noted above, Adelaida is performing much better in school and her behavioral problems have been dramatically reduced — improvements which, in the opinion of Mr. Lanz, are a direct result of the foster home environment. According to Dr. Schroeder, the foster mother has afforded Adelaida the opportunity to act as "the child," a role which Adelaida, to her great psychological and developmental detriment, has long been prevented from assuming in her interaction with the respondent. In the course of just the last nine months, Adelaida has already developed a relationship with her foster mother which is more trusting than that she maintains with the respondent. Adelaida has made extensive progress in this foster home and there is every reason to believe that she will continue to thrive within it.
The respondent does not seriously contest these findings, but instead argues that termination is not in Adelaida's best interests because her foster mother, though more than willing to continue in the capacity of a foster parent, has not decided if she will ask to adopt Adelaida. Evidence offered at the trial on this subject shows that the foster mother has expressed some concern that she is too old to adopt because of the risk that she may die before raising Adelaida to adulthood. Based upon this absence of a home fully and unwaveringly committed to adopting Adelaida, respondent's counsel and guardian ad litem argue that Adelaida's best interests will not be served by terminating her mother's parental rights — particularly since mother and daughter have a warm relationship and have each expressed a desire to be reunited with the other. Advancing a contrary position, the attorneys representing the state and Adelaida argue that, even in the absence of a family committed to adopting her, Adelaida's needs will best be served by providing her the permanency and stability that only a termination of respondent's parental rights can achieve. The court concludes, based upon the clear and convincing evidence, that the latter view is correct.
In resolving this issue, the court notes first that "although subsequent adoption is the preferred outcome for a child whose biological parents have had their parental rights terminated, it is not a necessary prerequisite for the termination of parental rights." In re Eden F.,250 Conn. at 709. In Eden F., as in the case here, the foster parents had refused to commit to an adoption because of their concern that they might not be able to provide the child with everything he needed to reach his full potential. Id. at n. 36. Eden F. is also similar to the case here because the foster parents, despite their reservations concerning CT Page 11862 adoption, wished for the child to remain in their home as a foster placement. Id. Eden F. counsels that, even where adoption is not assured, it may often still be in a child's best interests to have the rights of the biological parents terminated:
 While long-term stability is critical to a child's future health and development, adoption provides only one option for obtaining such stability. In this case, Eden's foster parents, despite hesitancy about committing themselves to adopting Eden, have indicated a willingness to provide Eden with a permanent foster home, assuming such a placement is determined to be in Eden's best interest. In light of this testimony, the trial court reasonably could have concluded that the possibility of a permanent foster placement with Eden's current foster family was preferable to the continuing uncertainty of the status quo. Id. at 709-10 (citation omitted).
Consistent with Eden F. and also with In re Breanna R.,2001 Ct. Sup. 3618
(March 13, 2001, Trombley, J.), In re Dorrell R.,2000 Ct. Sup. 5262
(May 2, 2000, Quinn, J.), In re Michael W., 2000 Ct. Sup. 7379 (June 20, 2000, Shapiro, J.) and In re Takeyma R., 2000 Ct. Sup. 2947 (March 17, 2000, Schuman, J.), the court here concludes that, despite the uncertainty as to whether Adelaida will ultimately be adopted, it remains in her best interest that the parental rights of the respondent be terminated.[15] The testimony presented at trial stressed that stability and permanency must be achieved if Adelaida is to adequately address her own significant needs. Dr. Schroeder also testified in this regard that the caretaking role Adelaida is forced to assume in her interaction with the respondent prevents Adelaida from establishing an appropriate relationship with her foster mother or with others who may assume her care in the future. The situation as it now stands is apparently so dire in the view of Dr. Schroeder that she believes that termination of the respondent's parental rights would be in Adelaida's best interest even if Adelaida's current foster mother was not available as a potential adoptive parent or as a long-term placement option.[16]
Based upon all of the evidence, the court concludes that the necessary stability and permanency can only be achieved by terminating the respondent's parental rights. In fact, the court agrees with Mr. Lanz that termination of the respondent's parental rights is clinically necessary for Adelaida's well-being.
In reaching this conclusion, the court notes that termination of the respondent's parental rights also provides the benefit to Adelaida of permitting her adoption, should her foster mother or another suitable CT Page 11863 person seek to do so. The court is persuaded that termination of the respondent's parental rights certainly will make her adoption more probable. In fact, Mr. Lanz testified that, although he is not certain, he believes that Adelaida's foster mother will adopt her. Ms. Mercado of DCF agrees that once Adelaida is legally free for adoption and her contact with the respondent can be ceased, there is a greater likelihood that the foster mother will adopt. Even if Mr. Lanz and Ms. Mercado prove to be incorrect in their interpretation of the foster mother's intentions, there still "lies the hope that once [Adelaida] is free for adoption, a wider and more concerted search for an adoptive home can be made, which will be successful." In re Dorrell R., 2000 Ct. Sup. 5262 (May 2, 2000, Quinn, J).
While the court may "genuinely sympathize" with the respondent given that she "loves her [child]," In re Ashley S., 61 Conn. App. 658, 667
(2001), the court may not overlook the fact that "termination has been consistently recognized as being in the best interests of the child when a parent has a mental deficiency or illness which renders her unable to provide the child with necessary care." In re Jessica S., 51 Conn. App. 667,673-74 (1999).[17] Granted, there is still no certainty about the future, and only time will tell whether Adelaida is adopted by her foster mother or by another suitable party, whether she remains in her current foster placement or whether, unfortunately, yet another foster placement must be sought. But whichever of these scenarios, or combination of scenarios, may eventually come to pass, the court concludes that Adelaida's interests will best be met by terminating the parental rights of the respondent. Only in this way will Adelaida have the opportunity to form a lasting relationship with a caregiver capable of providing her with the nurturing, safe and structured environment necessary to her sustained growth and development, and her physical, moral and emotional well-being.
 Order of Termination
The court, having considered all the statutory criteria and having found by clear and convincing evidence that grounds exist for termination of parental rights, and having determined that it is in the best interests of the child to terminate the parental rights of the respondent, accordingly ORDERS:
That the parental rights of the respondent, Victoria T.-C. are hereby terminated as to her daughter, Adelaida C.-T.
That the Commissioner of the Department of Children and Families is hereby appointed the statutory parent for Adelaida C.-T. for the purpose of securing an adoptive family or other permanent placement for the CT Page 11864 child.
That within thirty days of this judgment, the said Commissioner shall file a written report addressing a permanency plan for this child, and that such further reports shall be filed by DCF as are required by state and federal law.
BY THE COURT