IN RE SHYINA B.*
(AC 19721)

Schaller, Hennessy and Daly, Js.

---

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79-3, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

160

Argued January 18—officially released June 6, 2000

*Eliot D. Prescott*, assistant attorney general, with whom were *Carolyn A. Signorelli*, assistant attorney general, and, on the brief, *Richard Blumenthal*, attorney general, and *Susan T. Pearlman*, assistant attorney general, for the appellant (petitioner).

*Cynthia Hartwell-Russell*, for the appellees (intervenors).

*Elizabeth A. Edwards*, with whom was *Christine B. O'Sullivan*, for the appellee (respondent mother).

*Amy L. A. Klein*, for the minor child.

*Opinion*

SCHALLER, J. The commissioner of children and families (commissioner) appeals from the judgment of the trial court granting custody and guardianship of the minor child, Shyina B., to the intervenors, her maternal uncle and aunt. On appeal, the commissioner claims that the court improperly applied the best interest of the child standard when it (1) imposed a legal presumption that Shyina's placement with the intervenors was in her best interest, (2) sought to remedy the commissioner's denial of the intervenors' request to be licensed as foster parents of Shyina and (3) considered the race of the intervenors. We affirm the judgment of the trial court.

The following facts and procedural history are relevant to our disposition of this appeal. Shyina was born while her mother was awaiting trial for the murder of Shyina's half-sister. Shyina's mother subsequently was convicted of manslaughter in the first degree and sentenced to twenty years in prison. Because Shyina's mother was incarcerated at the time of Shyina's birth, the commissioner immediately obtained an order of temporary custody and placed Shyina with a foster family. At that time, the commissioner filed a neglect petition with respect to Shyina.

Shortly after the birth of Shyina, the intervenors learned of her birth and contacted the commissioner to declare themselves available as a placement resource for Shyina. The commissioner informed the intervenors that because the intervening aunt had a "record" with the department, placement with the intervenors would be problematic. The intervenors requested a copy of the record, but were told it was unavailable.[1] The commissioner later told the intervenors that because of the

---

[1] The commissioner ultimately produced the "record" pursuant to a court order.

record, Shyina could not be placed with them and that they could seek custody of her by moving to intervene if they so desired. The intervenors moved to intervene, and on January 6, 1998, by agreement, the court granted the motion for the dispositional phase only.

On January 16, 1998, the court granted the intervenors visitation rights with respect to Shyina. On July 9, 1998, the intervenors moved for custody and guardianship of Shyina. On August 18, 1998, the court adjudicated Shyina uncared for because she was homeless. The case was continued to September 16, 1998, when a dispositional hearing commenced. In a memorandum of decision dated June 9, 1999, the court recognized two available options with respect to the placement of Shyina: She could be committed to the custody of the commissioner, in which case she would remain in the care of the foster family, or her custody and guardianship could be granted to the intervenors. The court concluded that while both homes would be "fit, comfortable and safe settings for Shyina," a fair preponderance of the evidence showed that granting custody and guardianship of her to the intervenors would be in the child's best interest. This appeal followed. On July 20, 1999, in response to a motion by the commissioner, the court articulated its memorandum of decision. Additional facts will be set forth as necessary in the context of the commissioner's claims.

I

The commissioner claims first that the court improperly applied the best interest of the child standard when it imposed a legal presumption that Shyina's placement with the intervenors was in her best interest even though the relatives are not her parents, and that the commissioner, therefore, was required to rebut that presumption to persuade the court that Shyina should remain in the foster home. Because we conclude that

the court did not impose such a presumption, we need not address its propriety.

In support of this claim, the commissioner relies on portions of the court's memorandum of decision. In its memorandum of decision, the court stated that the "factor which weighs most heavily in favor of the disposition of a transfer of custody and guardianship to the [intervenors] is their close and strong biological tie to Shyina, her family and her mother." The court stated that "if at all possible, Shyina is entitled to be raised with her family, including her biological relatives" and, as expounded in its articulation, that "[o]n the other hand, depriving Shyina of [her right to live with] her biological relatives, when it has not been shown that placement with them would be detrimental to her, would certainly not be in her long-term best interests." (Internal quotation marks omitted.)

Read in isolation, these statements appear to support the commissioner's contention. Our review of the entire memorandum of decision, however, leads us to the contrary conclusion. At the outset, the court properly observed that in the search for an appropriate custodial placement, what is in the best interest of the child shall prevail; General Statutes § 46b-57; *Cappetta* v. *Cappetta*, 196 Conn. 10, 16, 490 A.2d 996 (1985); as shown by a fair preponderance of the evidence. *In re Joshua Z.*, 26 Conn. App. 58, 63, 597 A.2d 842, cert. denied, 221 Conn. 901, 600 A.2d 1028 (1991).

The court found that the foster home provided "a safe and nurturing environment" for Shyina and, if that was the only choice, "it would be a wonderful selection." The court also found that the intervenors' home provided "a safe, nurturing and appropriate environment for Shyina." These findings precede, in the memorandum of decision, the statements cited by the commissioner, which demonstrate that the court's ini-

tial determination was not that placement with the intervenors was presumptively in Shyina's best interest, but rather that both placements were desirable. Having made that determination, the court proceeded to weigh the alternatives, which is the context in which it made the challenged statements.

That the court did not impose a presumption is further shown by its response to the commissioner's motion for articulation. The court stated: "The relevant language . . . reads as follows: 'On the other hand, depriving Shyina of her biological relatives, when it has not been shown that placement with them would be detrimental to her, would certainly not be in her long-term best interests.' This portion of the decision must be read in the context of the decision as a whole. First, it is difficult to understand exactly what the state means by its claimed inquiry.[2] *The court did not apply any standard to Shyina's placement other than what would be in her best interest.* That standard was announced to the parties at the inception of the trial, was stated by the state in its memorandum of law in support of proposed findings of fact and held by the court to be the only standard defining the disposition of this case. Necessarily, what is expressed as affecting that standard, whether it be advantageous or detrimental, cannot be viewed as replacing that standard. It must be viewed in the context of how the specific facts and findings affect the ultimate standard of best interest. Secondly, the prefacing words, 'on the other hand,' indicate to the reader that the text relates to a prior point in the decision, here to the first full paragraph on page 15. The court, in this area of the opinion, is weighing the respective alternate options and setting out its reasoning for the ultimate decision of what is in Shyina's best

---

[2] The motion for articulation in relevant part requested the court to state the "[l]egal basis for applying a standard of whether a change in placement would be 'detrimental' to Shyina."

interest." (Emphasis added.) We conclude that the court did not impose a presumption in favor of the intervenors as a placement resource. Because the commissioner's claim depends on a contrary assertion, it must fail.

## II

The commissioner claims next that the court improperly applied the best interest of the child standard when it sought to remedy the commissioner's denial of the intervenors' request to be licensed as foster parents and that such improper remedy, coupled with the alleged improper presumption previously discussed, undoubtedly affected the court's decision to remove Shyina from the foster family and to place her with the intervenors. As to the presumption, we concluded in part I of this opinion that it was not imposed by the court. As to the claim that the court "attempted to redress in the dispositive phase of [the] neglect proceeding what it perceived as [the commissioner's] improper judgment refusing to license or certify the intervenors as foster parents," we are not persuaded.

The following facts from the court's memorandum of decision are undisputed. The intervenors came forward immediately upon learning of the premature birth of Shyina and expressed their desire to have her placed with them. Thereafter, they persisted in their endeavor. When they informed the commissioner of their intention, they were told that the aunt's "record" would prohibit placement with them. The intervenors requested a copy of the record, and the commissioner responded that it was not then available. After the commissioner informed them that they could file a motion to intervene to get custody, the intervenors did so, appeared at every court hearing with their private attorney and made it consistently clear that they wanted to have Shyina placed with them.

The court found that the aunt's record did not substantiate neglect and that the allegations contained therein were vague, indefinite and irrelevant to the issue of custody, but it found that the record was relevant to show why the commissioner refused to consider the intervenors as a viable placement resource. With that in mind, the court proceeded to examine the substance of the record, concluding, "It is clear to the court that [the commissioner] denied the [intervenors] the opportunity to be considered a placement resource for Shyina based upon this 'record' of [the aunt] even though [the] same was vague and indefinite, was based on facts that were not clear or substantiated and resulted in a conclusion ('at risk') that is no longer used by [the commissioner]. That denial, together with [the commissioner's] failure to produce [the] 'record' for approximately seven months after it was used as a reason for denying the [intervenors] the right to be considered as a placement resource, was fundamentally unfair. . . . [This court finds that the commissioner's] failure to even consider the [intervenors] based on the facts presented effectively deprived Shyina of an option that *may have* been in her best interest." (Emphasis in original.)

Although the court found that the commissioner's actions with respect to the intervenors were unfair, our review of the court's memorandum of decision reveals that the court did not attempt to remedy that unfairness when it concluded that it was in Shyina's best interest to be in the custody of the intervenors. Rather, the court's use of the history was, in part, to illustrate that the record was unsubstantiated, thereby rebutting the commissioner's position that Shyina should not be placed with the intervenors while supporting its own conclusion as to which placement would be in Shyina's best interest. This is shown by the court's statements that the "record" was "relevant to show why the com-

missioner refused to consider the intervenors as a viable placement resource" and that "[the commissioner's] failure to even consider the [intervenors] based on the facts presented effectively deprived Shyina of an option that *may have* been in her best interest." (Emphasis in original.) The court also utilized the history to demonstrate that from the time that they first learned of Shyina's birth, and despite the commissioner's refusal to consider them as an option, the intervenors persevered in their pursuit by hiring an attorney, attending all hearings and continuously expressing their desire to care for Shyina. In short, the court engaged in an assessment of the fitness of the intervenors as prospective custodians of Shyina. "The guiding principal in determining custody is the best interests of the child. . . . The best interests of the child include the child's interests in sustained growth, development, well-being, and continuity and stability of its environment." (Citations omitted; internal quotation marks omitted.) *Schult* v. *Schult*, 241 Conn. 767, 777, 699 A.2d 134 (1997). Whether the intervenors are fit to care for Shyina is clearly relevant to the court's determination of the best interest of Shyina. The court, therefore, properly considered the history of the relationship between the intervenors and the commissioner in this case.

### III

The commissioner claims finally that the court improperly considered the race of the intervenors when it applied the best interest of the child standard. We disagree.

Rodolfo Jose Rosado, a court-appointed psychologist, testified that "from a cultural aspect, with African-American and African-Caribbean families, [they] have long used extended family supports where children are surrounded by a variety of relatives who love them and take care of them, and they can develop attachments

and enduring attachments with each [individual] and the attachments would be sustained despite geographical difference or differences of time. And that, because, people say, 'We love you, you're one of us,' and, 'We belong together.' And even [though] a child may not have physical contact with the adults all the time, there is a feeling of mutual support in a sense of belonging [as] an affiliation." In its memorandum of decision, the court stated: "In fact, the [intervenors'] family presents a good example of this phenomenon as they have, during the pendency of this action, actually taken into their home two children of [the aunt's] sister . . . and have moved to Waterbury to secure a larger apartment to accommodate these children and the hopeful addition of Shyina." The commissioner moved the court to articulate the "[r]elevance of Dr. Rosado's testimony regarding [the] phenomenon of the cultures of African-Americans and African-Caribbeans utilizing extended family supports to the facts of the current case where the [intervenors] are a biracial couple . . . ." The court responded: "Shyina, her mother . . . and her uncle . . . are all African-American people. They are from, and comprise a part of, an African-American family. Rosado testified to the phenomenon of extended family supports being utilized especially in African-American and African-Caribbean families. The relevance is clear, self-explanatory and requires no further clarification. Due weight was given to the testimony in light of the specific facts and circumstances of this case."

The commissioner argues that "family support systems" have "no legal relevance" to what is in Shyina's best interest. As we set forth in part II of this opinion, Shyina's best interest includes her interest in "sustained growth, development, well-being, and continuity and stability of [her] environment." Id. We conclude that the extent to which the intervenors' family might contribute to the care of Shyina is relevant to those factors

and, therefore, that it properly was considered by the court.

The judgment is affirmed.

In this opinion the other judges concurred.