MEMORANDUM OF DECISION
This memorandum of decision addresses petitions brought to terminate the parental rights (TPR) of Janice K. and Gregory B., the biological parents of Samantha B., born December 1986, Julie B., born November 1991; and Kevin B., born May 1994. The Department of Children and Families (DCF) filed TPR petitions against each respondent on April 16, 2001. The original TPR petition against Janice K. alleged the grounds of abandonment, failure to rehabilitate, act of omission or commission, lack of ongoing parent-child relationships and, as to Kevin, parental failure to rehabilitate in relation to a child under the age of seven given a history of prior termination of parental rights. The corrected TPR petition against Gregory B. alleged the grounds of abandonment, failure to rehabilitate, lack of ongoing parent-child relationships and, as to Kevin. parental failure to rehabilitate in relation to a child under the age of seven given a history of prior termination of parental rights. For the reasons stated below, the court finds these matters in favor of the petitioner.
The history of this file reflects that DCF obtained custody of all three children through a 96-hour hold imposed on February 1, 2000; an ex parte Order of Temporary Custody (OTC) entered by the court on February 2; and confirmation of the OTC after hearing on February 7, 2000. On June 19, 2000, the children were found to be neglected while in the care and custody of Janice K. Thereafter, on July 31, 2000, they were committed to DCF. Samantha, Julie and Kevin have been maintained in DCF custody since that date, pursuant to orders of the court. CT Page 12549
Trial of this highly-contested matter took place on March 20, 21, 22; April 4 and May 24, 2002. On June 6, 2002, the court received a transcript of the sentencing hearing held on May 6, 2002, clarifying the evidence related to several relevant TPR allegations pending against Gregory B. The petitioner and the respondent parents were vigorously represented throughout the proceedings, as were the children.[2] On March 20, 2002, the court (Lopez, J.) accepted Janice K.'s consent to the termination of her parental rights to all three children; subsequently, the TPR petition was amended to allege the sole ground of consent against this respondent.
The Child Protection Session, Superior Court for Juvenile Matters, has jurisdiction over the pending case. Notice has been provided in accordance with the applicable provisions of the Practice Book. No action is pending in any other court affecting custody of these children.
 I. FACTUAL FINDINGS
The Court has thoroughly reviewed the verified petitions, the TPR social study[3] and other DCF reports, and the multiple other documents submitted in evidence which included court records, psychological and psychiatric reports, curriculum vitae, records of criminal activity, and photographs. The court has utilized the applicable legal standards[4] in considering this evidence and the testimony of trial witnesses, who included a psychiatrist, two psychologists, social workers, a therapist, foster mothers, family friends and relations.[5] Upon deliberation, the court finds that the following facts were proven by clear and convincing evidence at trial:
 I.A. EVENTS PRIOR TO THE NEGLECT ADJUDICATION OF JUNE 19, 2000
Gregory B. was born on November 23, 1961. He was educated through the tenth grade, joined the army, and was employed as a truck driver and construction worker in the past. (Exhibits 16, 17, 20; Testimony of Evelyn B.) In 1982, he married Janice K.
The couple's first child, Jamie B., was born to Janice K. and Gregory B. on April 4, 1984. Their second child, Steven B. was born on March 10, 1985. On May 14, 1986, the court (Dean, J.) adjudicated Jamie and Steven to be neglected children, and committed them to the custody of DCF's predecessor agency. TPR petitions affecting these children were filed on March 7, 1988; the social study accompanying that petition asserted that Gregory B. had "not maintained a relationship with any of his children" and that he had demonstrated little interest in their well being. (Exhibit 36.) Subsequently, the court found that Gregory B. had abandoned CT Page 12550 the children; that both respondents had failed to achieve rehabilitation; and that neither respondent had an ongoing parent-child relationship with either child. The respondents' parental rights to Jamie and Steven were terminated by the court (Barnett, J.) on June 7, 1989. (Exhibits 1, 2, 36.)
Janice K. and Gregory B. remained together. Samantha's birth followed on December 1986, and Julie was born on November 1991. In November 1993, Gregory B. threatened to kill Janice K., who was then pregnant with the couple's fifth child. In fear, Janice K. took the children, left her husband, and thereafter lived apart from him. (Exhibit 9.) Kevin was born on May 1994.
On January 24, 2000, DCF filed neglect petitions on behalf of Samantha, Julie and Kevin. As to Gregory B., the accompanying factual statement set forth the petitioner's claims that, inter alia, he was "whereabouts unknown and has failed to provide any financial, emotional or physical care for his children."[6] (Exhibit 36.) On that date, the court [Brenneman, J.] ordered that notice by publication should be provided for Gregory B. (Exhibits 26, 27, 31.) On February 2, 2000, the court (Dennis, J.) issued ex parte OTC's for the children; the orders were sustained (Brenneman, J.) at a hearing held on February 7, 2000.[7]
(Exhibit 36.)
On February 14, 2000, Gregory B. appeared at another hearing, and was advised of his legal rights. Upon inquiry by the court (Dennis, J.), Gregory B. stated that he had no regular address in Connecticut, and that he was living in Pennsylvania. He informed the court that he learned of the proceedings when a relative showed him an article that appeared in the local paper. Stating that he had already secured the services of counsel, Gregory B. declined the opportunity to provide his address on the record, and was thereupon directed to write out his address, with his zip code and a phone number, and to provide it to the court services officer. (Exhibits 25, 36; Tr. 2/14/00.) He stated that he wanted to have nothing to do with his children. (Exhibit 13.)
On March 13, 2000, Janice K. and her three children participated in a court-ordered family evaluation conducted by Rodolfo Rosado, Ph.D., a skilled clinical psychologist with extensive academic and practical experience. (Exhibit 19.)
On June 19, 2000, upon Janice K.'s tender of nolo contendere pleas, the court (Dennis, J.) found that all three children were neglected.[8]
Gregory B. did not attend this hearing. CT Page 12551
 I.B. EVENTS FOLLOWING THE NEGLECT ADJUDICATION OF JUNE 19, 2000
Soon after the neglect adjudication, Gregory B. called DCF and asked the family's assigned DCF social worker, Michelle W., to arrange a visit with his children. At the time, Gregory B. was unemployed, living with a friend, and was unsure whether he would remain in the area or move again. He did not wish to serve as a placement resource. Michelle W. advised Gregory B. to raise the issue at the next court hearing. (Exhibits 9, 12; Testimony of Michelle W.)
Disposition of the neglect matter has been deferred until July 31, 2000, when the court (Riefberg, J.) committed all three children the custody of DCF. Gregory B. attended that hearing, although he had not participated in any other proceedings since February 14, 2000. In response to the respondent father's inquiry, the court advised Gregory B. to confer with DCF regarding visitation. In court, Michelle W. indicated that she was available to meet with Gregory B. at the DCF office after the hearing. (Exhibit 36; Testimony of Michelle W.; Tr. 7/31/00.) At the meeting that followed, Michelle W. explained to Gregory B. that in view of his long absence from the children's lives and due to current behavioral problems, DCF would have to consult with their therapists before visits could commence. (Testimony of Michelle W.)
To determine whether visits with Gregory B. would have an effect upon the children, DCF conferred with the therapist who was then treating Samantha and Julie, and also with Kevin's therapist. The mental health providers consistently recommended that visitation be withheld due to the lapse of time, the children's limited recall of their father, and their severe acting out behaviors. Michelle W. relayed this information to Gregory B. on two separate occasions in August 2000. (Testimony of Michelle W.)
On October 25, 2000, Gregory B. was involved in an incident in the DCF parking lot. Feeling that DCF was wrongfully keeping him from seeing his children, he "brought an axe to the DCF office and raised it against `the social worker lady who was in the car at the DCF building.'"[9]
(Exhibit 16; see also Exhibit 11.) Gregory B. was arrested at the scene and charged with Assault in the first degree, Attempted Assault, Carrying a Dangerous Weapon, and Threatening.[10] (Exhibit 3.) The respondent father has remained incarcerated for since that event.
On February 2, 2001, Gregory B. underwent a court-ordered evaluation performed by David Krulee, M.D., a board certified psychiatrist with long experience in diagnostic and forensic evaluations, family psychotherapy, and other aspects of child, adolescent and adult psychiatry. (Exhibits CT Page 12552 16, 30; Testimony of Dr. Krulee.)
On February 7, 2001, upon hearing, the court (Dewey, J.) found that continued efforts for reunification were no longer appropriate for either parent, but indicated that the subject would be reviewed after the court-ordered evaluations of Gregory B. were completed.[11] (Exhibit 36.) On March 9 and April 25, 2001, Gregory B. underwent court-ordered evaluations conducted by David Mantell, Ph.D., a skilled clinical psychologist with lengthy experience in treatment and forensic assessments. (Exhibit 24.) Dr. Mantell reported that during the evaluations, Gregory B. appeared as a poor historian who was resistant to exploration of some significant questions, and who "laughed repeatedly, cynically and sarcastically as he spoke, his laughter expressing frustration and cynicism about this matter."[12] (Exhibits 17; Testimony of Dr. Mantell.)
 I.C. EVENTS FOLLOWING THE FILING OF THE TPR PETITION ON APRIL 16, 2001
On May 9, 2001, following the completion of Gregory B.'s psychiatric and psychological evaluations, the court (Dewey, J.) again found, after hearing, that continued efforts for reunification were no longer appropriate for either parent, and that the petitioner had no duty to make further efforts to reunify the children with either Gregory B. or Janice K.[13]
The respondent parents' fifth child, Michaela K., was born on June 2001. An uncared for petition was filed on this child's behalf on June 18, 2001, alleging Janice K.'s lack of capacity to provide her with care, and also alleging Gregory B.'s present incarceration; the court (Reynolds, J.) imposed an OTC on that date. The court (Levin, J.) sustained the OTC after hearing on July 2, 2001, and specific steps were issued for Gregory B. with regard to Michaela only. On September 19, 2001, the court (Reynolds, J.) adjudicated Michaela an uncared for child and committed her to DCF custody.[14] (Exhibit 36.)
On March 19, 2002, Gregory B. was found guilty after trial of the crimes of Attempted Assault in the first degree, Carrying a Dangerous Weapon, and Threatening. On May 6, 2002, while the TPR trial was progressing, Gregory B. was sentenced (Kavanewsky, J.) to a total effective sentence of five years of incarceration, followed by a consecutive period of five years of special parole. The conditions of special parole included mental health evaluation, counseling and treatment; no contact with DCF and DCF victims designated by the Parole Board unless initiated by the child protection agency; and full time employment. (Exhibit 4, Court Exhibit 1; Tr. 5/6/02.) CT Page 12553
On March 20, 2002, the court (Lopez, J.). accepted Janice K.'s valid consent to TPR. Subsequently, the TPR petition against her was amended to reflect the sole ground of consent.
I. D. THE CHILDREN
Samantha and Julie live together in foster care with Brenda P. and her husband. They regularly visit with their brother Kevin; all three siblings enjoy the visits, find them beneficial, and would like to be placed together. (Exhibit 12.) The girls' foster parents love Samantha and Julie, and wish to adopt them. (Exhibit 13; Testimony of Brenda P.)
I. D. 1. SAMANTHA AND JULIE
Samantha was born on December 1986; her younger sister Julie was born on November 1991. Both girls were sexually abused by Roger B., their mother's boyfriend.
Upon issuance of the OTC in February 2000, Julie was placed with Brenda P. and her husband. Samantha had originally been placed in a shelter, but she joined Julie at the foster home two weeks later. (Exhibit 7.) While they are comfortable, secure and happy in their placement, both girls have demonstrated troubling, premature sexual behaviors; they participate in counseling to address attendant concerns. Samantha has a history of suicide attempts, and has had several hospital admissions to deal with this situation. She has been diagnosed with Oppositional Defiant Disorder and is currently in therapy at Waterbury Child Guidance. (Exhibits 9, 13; Testimony of Michelle W., Brenda P.) Despite her psychological needs, Samantha "enjoys school and is an honor roll student. . . . [S]tudying is important to her because she would like to go to college and go on to do great things." (Exhibit 13.)
Diagnosed with Post Traumatic Stress Disorder, Julie has also been admitted to partial hospitalization programs. She too is receiving therapy at the Waterbury Child Guidance Center and takes medication to treat the problems she encounters in thought processing. Julie has been described as "a hard working student who loves school and participating in class. She is very outgoing and has many friends." (Exhibit 13; Testimony of Brenda P.)
I.D.2. KEVIN
Kevin was born on May 1994. While he lived with Janice K. and her partner Roger B., Kevin was subject to sexual and physical abuse in CT Page 12554 addition to neglect and lack of care. (Exhibit 23.) Upon his entry into foster care in February 2000, Kevin had difficulty with hyperactivity, impulsivity. tantrums, emotional lability and aggression towards his foster mother although, for a time, he was able to establish a positive relationship with her. By the Spring of 2000, however, his behavior had become increasingly unpredictable and aggressive. He was removed from his foster home and placed in a short-term residential center where he made verbal threats, disobeyed limits, and often placed himself at risk for physical harm through impulsive behavior. (Exhibit 23.)
After a period of therapy at the Mid-Fairfield Child Guidance, Kevin was diagnosed with Reactive Attachment Disorder, Generalized Anxiety Disorder, and Pica. (Exhibit 9.) On September 1, 2000, Kevin was admitted to the Yale-New Haven Child Psychiatric Unit (Yale) for evaluation and treatment. He was found to be of average intelligence, but he lacked the ability to maintain attention, which lessened his capability to perform tasks requiring sustained effort and concentration. Testing demonstrated that Kevin "does not appear to have a secure sense of himself within a family or of family life in general." (Exhibit 23.) He repeatedly expressed a sense of vulnerability in imagined circumstances that are dangerous or fatal, and he lacks "the means for successfully managing intense emotions."[15] (Exhibit 23.) His "preoccupation with danger and insecurity contribute to a sense of helplessness and hopelessness." (Exhibit 23.) Kevin is vulnerable to depression, which at his young age is expressed through irritability, low frustration-tolerance, disengaging; emotional outbursts; and a feeling of being overwhelmed. In addition, Kevin's disorganized and distorted thinking "is characteristic of a thought disorder." (Exhibit 23.) Significantly, the Yale staff concluded that his style of thinking and coping are likely to jeopardize "[m]any of the developmental challenges present at Kevin's age." (Exhibit 23.)
Upon his discharge from the Yale's psychiatric inpatient program, Kevin was placed at the center's sub-acute cottage, as he requires a "home setting with plenty of structure and boundaries." (Exhibit 13.) From November 2000 through January 2002, Kevin was a resident at the START program, where he was followed for Post Traumatic Stress Disorder and Attention Deficit Hyperactivity Disorder. Despite intensive individual and group therapy, Kevin's aggressive and out-of-control behaviors were slow to resolve. Thereafter, he was transferred to a therapeutic foster care setting, in the home of Mr. and Mrs. B., where he remained at the time of trial. (Testimony of Ronda C., Mrs. B.) In this placement, following the prescribed medication regimen and subject to loving, consistent care, Kevin's behavior has continued to improve. (Testimony of Mrs. B.) Since January 2002, Kevin has been receiving weekly individual CT Page 12555 clinical therapy from Michelle W., who had previously worked as the family's DCF social worker. Holding a masters degree in social work, she now works at a private non-profit social service agency. (Exhibit 29; Testimony of Michelle W.)
 II. ADJUDICATION
In the adjudicatory phase of this hearing,[16] the court has considered the evidence related to circumstances and events prior to April 16, 2001, the date upon which the TPR petition against Gregory B. was filed, insofar as the allegations pertaining to abandonment and lack of an ongoing parent-child relationship are concerned.[17] With regard to the allegations of failure to achieve rehabilitation brought against Gregory B., the court has also considered the evidence and testimony related to circumstances occurring through the close of trial.[18] Upon review, as discussed below, the court has determined that statutory grounds for termination exist as to Gregory B., and relies upon the valid consent to TPR tendered by Janice K.
II. A. LOCATION AND REUNIFICATION EFFORTS
"In order to terminate parental rights, DCF must prove, by clear and convincing evidence, the statutory element requiring "reasonable efforts to locate the parent and to reunify the child with the parent, unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts provided such finding is not requiredif the court has determined at a hearing . . . that such efforts are notappropriate." (Emphasis added.) General Statutes § 17a-112 (j) (1). As found by clear and convincing evidence in Parts I. B. and I. C., the court had determined at hearings held on February 7 and May 9, 2001, that reunification efforts were no longer appropriate for Gregory B., so that DCF was relieved of any obligation to provide him with § 17a-112 (j) (1) services.[19] In addition, as described below and in Part II. C., giving careful consideration to the totality of the circumstances of this particular case, the court now finds by clear and convincing evidence that Gregory B. is either unable or unwilling to benefit from any reasonable reunification efforts that may be contemplated by § 17a-112 (j) (1).[20]In re Hector L., supra, 53 Conn. App. 372.
The petitioner has proved, by clear and convincing evidence, that reasonable efforts to locate Gregory B. would have been ineffective prior to the issuance of the OTC in February 2000, as the respondent father did not maintain any stable residence, and as he had failed to maintain any contact with his children since 1993, before Kevin was born. (Exhibit CT Page 12556 13; Testimony of Evelyn B., Josephine B.) Upon inquiry of Janice K. in 1996, when DCF first became involved with the family, the agency attempted to locate Gregory by inquiring of the respondent mother, who reported that she had no idea of his whereabouts. In addition, DCF was unable to obtain any additional information about the respondent father's location despite checks with the Visiting Nurse service that was assisting the family on a daily basis; discussions with the children's schools and physician; reference to local phone listings and criminal history checks. When DCF again became involved with the family in 2000, the agency attempted to locate Gregory B. by inquiring of the respondent mother and her boyfriend Roger B., and the children: all reported that Gregory B.'s whereabouts were unknown. (Testimony of Robert M.) DCF could not locate Gregory B. despite diligent contacts with family members, checks of the local telephone directories, the Department of Motor Vehicles, the Department of Corrections (DOC) and the Department of Social Services. (Exhibits 27, 31.) At the initiation of these proceedings, Gregory B. claimed that he lived in Pennsylvania, and that he responded to the court's published notice of the litigation affecting his children's well-being only because a relative brought the matter to his attention. (Exhibits 25, 36.) He was reluctant to state his address and phone number on the record, despite the court's inquiry. (Testimony of Michelle W.; Tr. 2/14/00.)
Overall, Gregory B. has never made himself available for serving Samantha, Julie or Kevin in any parental role: this voluntary, long-term abrogation of his obligation to support or nurture the children at issue in this case, in much the same way that he abandoned his children Jamie and Steven as described in Part I. A., renders it likely that Gregory B. would not have responded in any meaningful way to any DCF efforts to engage him in a new reunification process. Under the circumstances of this case, any efforts to locate Gregory B. would likely have been futile, and "[i]t is axiomatic that the law does not require a useless and futile act."[21] In re Antony B., 54 Conn. App. 463, 476,735 A.2d 893 (1999).
The evidence clearly and convincingly establishes that DCF considered providing visitation to Gregory B. prior to his participation in the court-ordered psychiatric evaluation of February 2001 and the court-ordered psychological evaluations of March and April 2001, but that the agency reasonably declined to make visits available to him. Following the issuance of the OTC in February 2000, DCF reasonably relied upon Gregory B.'s statement that he did not want to have anything to do with his children, and therefore did not extend services to him. When Gregory B. requested visitation with his children in July 2000, this service was deferred pending consultation with the children's therapists, and then CT Page 12557 reasonably withheld in reliance upon the recommendation that unsolicited contact with the respondent father would not benefit the children, and could exacerbate their conditions. (Testimony of Michelle W.) Gregory B.'s incarceration commenced on October 25, 2000 and has continued to the present; his status as a DOC inmate has rendered DCF unable to provide reunification or rehabilitation services for him, other than visitation,[22] which was still withheld in reliance upon the recommendations of the children's therapists. (Exhibit 11; Testimony of Michelle W.) "No other services were offered to the biological father . . . as his whereabouts were unknown and he had not been a part of his children's lives for approximately six years" prior to the issuance of the February 2000 OTC. (Exhibit 13.) Under all the circumstances affecting this case, DCF did not act unreasonably in withholding visitation from Gregory B.
Furthermore, based on the totality of the clear and convincing evidence here presented, the court finds that Gregory B. is unable or unwilling to benefit from reasonable reunification services, within the meaning of § 17a-112 (j) (1). Gregory B.'s pattern of providing misleading or erroneous historical information to mental health professionals was mirrored in his lack of cooperation or candidness with DCF.[23] His decision and willingness to spend so many years away from his children without showing interest in them and without providing any financial support for their basic needs; and his decision to use a dangerous weapon in October 2000 as a means of communicating or attempting to resolve a difference with a DCF employee, all clearly and convincingly illustrate his fundamental inability or unwillingness to observe the minimal standards of safe parenting behavior. The court credits the testimony of Dr. Krulee, the court-appointed psychiatric evaluator, who clearly opined that while Gregory B. may have been an appropriate candidate for therapeutic mental health treatment in 1994 just after he left Janice K. and the children, his dysfunctional personality characteristics had become so entrenched that by the spring of 2000, any such therapeutic intervention was likely to be of little or no value to him.[24]
(Testimony of Dr. Krulee.) This expert opinion was consistent with that tendered by the court-appointed psychological evaluator, Dr. Mantell, who explained that Gregory B.'s antisocial personality traits are not amenable to treatment, and that given the respondent father's lack of motivation or insight into his own responsibility for the events that have affected him, his condition is not likely to improve.[25] Under these circumstances, the provision of mental health counseling or other services would likely have been futile insofar as Gregory B. is concerned. As "the law does not require a useless and futile act," the court is constrained to conclude that Gregory B. was unable or unwilling to benefit from reasonable reunification services. In re Antony B., CT Page 12558 supra, 54 Conn. App. 476.
 II. B. STATUTORY GROUNDS FOR TERMINATION — ABANDONMENT — § 17a-112 (j) (3) (A)
The petitioner first alleges that Gregory B. abandoned his children within the meaning of § 17a-112 (j) (3) (A).[26] Applying the requisite legal standards[27] and construing the statute in compliance with § 17a-112 (p),[28] the court finds this matter in favor of the petitioner.
A review of the clear and convincing evidence related to Gregory B.'s conduct reveals that from the date of commitment, June 19, 2000 through the April 16, 2001, this respondent failed "to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child[ren]" at issue in this case. In re Deana E., supra,61 Conn. App. 193. As found in Part I. A., when he appeared in court in February 2000 to address issues related to his offspring, Gregory B. indicated that he wanted to have nothing to do with the children. On the record, he was unwilling even to provide the court with an address or phone number at which he could be reached, indicating his unwillingness to cooperate with DCF, the children's guardian. Further showing his lack of interest in the children, the evidence clearly and convincingly establishes that although he had been provided with notice of the proceedings in February 2000, several additional months passed before Gregory B. contacted DCF in July 2000 to ask for visitation, although he had never even seen his son Kevin. When Gregory B. indicated that while he wanted to see his children, it was for a limited purpose; he did not wish to be a resource for his children, indicating his willingness to cede to others the responsibility for their care and welfare. During the entire adjudicatory period, Gregory B. never sent cards, letters or any other written communications to be delivered to the children; he provided no financial support for the children; he did not supply them with food, clothing, medical care or a place to live; and he did not express love, affection, any interest or concern over the children's education or well-being, other than in the context of questioning the nature of Roger B.'s sexual contact with his daughters.[29] In re Deana E., supra,61 Conn. App. 193. As found in Part I. B., in August 2000, DCF reasonably declined to extend visitation to Gregory B., given his long absence from the children's lives and acting in reliance upon the specific recommendations of the children's therapists. (Exhibit 13; Testimony of Michelle W.)
Furthermore, from October 25, 2000 through April 16, 2001, the part of the adjudicatory period during which Gregory B. was incarcerated, he CT Page 12559 still failed to write to the children or attempt to telephone them. He thus failed to "make use of available, albeit limited, resources for communication" to which he retained access while imprisoned. (Internal quotation marks omitted.) In re Shane P., 58 Conn. App. 244, 256,754 A.2d 169 (2000). The evidence clearly and convincingly shows that Gregory B.'s efforts to maintain contact with his children were minimal, at best, while he was at liberty, and that he made no such efforts once he was incarcerated. (Testimony of Joshua O.) Although the imprisonment that followed October 25, 2000 does not constitute abandonment in and of itself, it does not excuse the respondent father's failure to attempt to establish or maintain contact with his children through the child protection agency. In re Deana E., supra, 61 Conn. App. 194.
Our courts have held that in considering issues of abandonment, the court should focus upon the conduct of the parent, remaining ever mindful that "[a] parent's interest in his child[ren] must not merely be sporadic in nature, but must exist on a consistent and continuing basis. See In reMigdalia M., 6 Conn. App. 194, 210, 504 A.2d 533, cert. denied,199 Conn. 809, 508 A.2d 770 (1986)." In re Shane P., supra,58 Conn. App. 256. The clear and convincing evidence in this case shows that Gregory B.'s interest in his children barely reached the even the level that might reasonably be considered "sporadic" in nature. During the adjudicatory period Gregory B. did not in any way does not display love or affection for his children, and he demonstrated no meaningful concern for their welfare.[30] Through this conduct, Gregory B. persisted in the pattern he had established since 1993, when Janice K. left him due to his threat of violence: he has abandoned Samantha, Julie and Kevin within the meaning of In re Deana E., supra, 61 Conn. App. 193.
When the adjudicatory date of April 16, 2001 is applied, the evidence in this matter clearly and convincingly establishes that Gregory B. has failed the test of meeting "[t]he commonly understood obligations of parenthood" identified In re Deana E., supra, 61 Conn. App. 193. Accordingly, based on clear and convincing evidence presented in this case, the court finds that the petitioner has met her burden of proving that Gregory B. has abandoned Samantha, Julie and Kevin within the meaning of § 17a-112 (j) (3) (A).
 II. C. STATUTORY GROUNDS FOR TERMINATION — FAILURE TO REHABILITATE — § 17a-112 (j) (3) (B) (i)
The petitioner next alleges that Gregory B.'s parental rights should be terminated because he has failed to achieve rehabilitation within the meaning of § 17a-112 (j) (3) (B).[31] As Samantha, Julie and Kevin were found to be neglected children on June 19, 2000, the critical CT Page 12560 remaining issue is whether the respondent father has achieved rehabilitation sufficient to render him able to care for either of his daughters or his son. Applying the requisite legal standards[32] and construing the statute in compliance with the mandate of § 17a-112
(p), the court finds this issue in favor of the petitioner.
Several aspects of the clear and convincing evidence in this case compel the conclusion that Gregory B. has yet to achieve a sufficient degree of rehabilitation with regard to the underlying issues of his poor judgment, lack of impulse control, antisocial behavior, lack of cooperation with authority figures and irresponsibility such as would encourage the belief that at some reasonable date in the future he could assume a responsible position in the lives of any of his children. See Inre Daniel C., supra, 63 Conn. App. 354; In re Ashley S., supra,61 Conn. App. 665; In re Sarah Ann K., supra, 57 Conn. App. 448. First, the psychological evidence in this case clearly and convincingly establishes that Gregory B. has not achieved § 17a-112 (j) (3) (B) rehabilitation. Dr. Mantell's psychological testing and evaluation demonstrates the significant degree of mental confusion and persecutory ideas which pervade Gregory B.'s personality.[33] The court credits Dr. Mantell's diagnosis, based on his thorough and detailed psychological assessment of the respondent father, which indicated that Gregory B.'s behavior is affected by antisocial, self-defeating, dependent and depressive personality traits. In view of the test results demonstrating Gregory B.'s poor judgment and his propensity to act impulsively, the court also credits and adopts Dr. Mantell's uncontroverted expert opinion that Gregory B. "should be regarded as potentially dangerous, at least situationally, since he feels that he is experiencing a grave injustice by a State that is indifferent to his needs."[34] (Exhibit 17.) The court further credits Dr. Mantell's opinions, based upon his thorough analysis of Gregory B. and his psychological status, that the respondent father's substantial personality problems adversely affect his ability to adequately communicate with others; leave him at chronic risk for reincarceration due to the likelihood that he will offend again in the future; and effectively render him unable to serve as a reliable parent for his children.[35] As Dr. Mantell explained, Gregory B.'s antisocial personality configuration is static and not likely to improve notwithstanding any treatment that could be tendered, as his conditions do not respond to medication and as his lack of motivation and lack of insight into his personal problems render it unlikely that any progress in his personal life, or parenting capacity, could be achieved by counseling. See Part II. A. (Testimony of Dr. Mantell.)
Second, from a psychiatric standpoint, the evidence again clearly and convincingly establishes that Gregory B. has not achieved § 17a-112
CT Page 12561 (j) (3) (B) rehabilitation. Like Dr. Mantell, Dr. Krulee found that Gregory B. was not forthright or honest in his explanations about past behaviors. (Exhibit 16; Testimony of Dr. Krulee.) The court fully credits Dr. Krulee's finding that Gregory B. "chronically underestimates his role in contributing to his life problems, demonstrates poor impulse control when under stress, holds grudges and blames others for his own shortcomings, and lacks appropriate coping resources."[36] (Exhibit 16.) Consistent with the psychological findings of Dr. Mantell, Dr. Krulee found that Gregory B. is potentially dangerous, and that he is affected by a personality disorder with antisocial, impulsive, self-defeating features and passive-aggressive characteristics, leading the respondent father to "use maladaptive strategies for dealing with life situations." (Exhibit 16; Testimony of Dr. Krulee.) Significantly, Dr. Krulee credibly opined that Gregory B.'s personality disorder has likely affected him since adolescence, without change: his lack of insight makes it unlikely that the respondent father would adequately cooperate with psychiatric treatment sufficient to derive any measurable benefit. The court credits and accepts the Dr. Krulee's determination that, from a psychiatric standpoint, Gregory B.'s prognosis for rehabilitation is poor, due to his lack of maturity and introspection and his limited willingness or ability to confront the objective unreasonableness of his actions. (Testimony of Dr. Krulee.)
In view of the clear and convincing evidence of the respondent father's psychological and psychiatric status, the court finds that any child entrusted to Gregory B.'s care now or in the reasonably foreseeable future would be deprived of the stability, control, nurturing and socially appropriate parenting behaviors which are fundamental to safe and effective child care. Moreover, insofar as the particular needs of Gregory B's children are concerned, all three are affected by manifest psychological problems of their own, as described in Part I. D. Samantha and Julie require consistent out-patient therapy, facilitated by their caregivers. Kevin's more serious underlying mental health problems require his placement in highly structured and organized home setting, where boundaries are firmly established, conduct is closely monitored, and medication is administered as scheduled. (Exhibit 13.) Gregory B's own unresolved personality issues, so entrenched and not amenable to amelioration through psychotherapy or other measures, affect him in such a way that it would be unreasonable to conclude either that he has the capacity now, or in the foreseeable future, to provide either his daughters or his son with the particular care and attention required by their special mental health needs. (Testimony of Dr. Krulee.) In reAmneris P., supra, 66 Conn. App. 384-85, In re Ashley S., supra,61 Conn. App. 665; In re Sarah Ann K., supra, 57 Conn. App. 448. Simply put, Gregory B. has yet not achieved a degree of rehabilitation with CT Page 12562 regard to his own lack of insight, impulse control, and other features sufficient to support the determination that he may be able to resume a useful role in his children's lives within a reasonable time in the future. In re Stanley D., supra, 61 Conn. App. 230.
Third, the empirical evidence clearly and convincingly proves that Gregory B. has not achieved rehabilitation within the meaning of the statute at issue. Although he has work experience as a truck driver and has performed some odd jobs for close friends, the evidence provides insufficient basis from which the court could reasonably conclude that he has the present financial maturity to secure housing, clothing or food for himself or his three school-aged children; he will not achieve that ability during the remaining period of his incarceration.[37]
Significantly, the historical evidence of his use of an ax to threaten a DCF worker in October 2000, as found in Part I. B., demonstrates that the respondent father is wont to use poor judgment and violent acts as a means of resolving disputes, thereby placing others in danger and exposing himself to the consequences of interaction with the criminal justice system.[38] In the course of his evaluations by Dr. Mantell and Dr. Krulee. Gregory B. demonstrated a pattern of giggling which was inappropriate for the circumstances, as described in Part I. B. Gregory B. failed to provide consistent information to either evaluator, and specifically evaded Dr. Mantell's reasonable questioning about his whereabouts and address during the years prior to his incarceration. (Exhibit 17; Testimony of Dr. Mantell.) Gregory B.'s continuing proclivity to use violent behavior or inappropriate conduct in resolving disputes was established through his promise to "be mad" if his parental rights are terminated, and through the further threat he expressed to Dr. Mantell, that "he will probably throw a chair at the judge." (Exhibit 17; see also Testimony of Dr. Mantell.) Such conduct is inimical to the resumption of a responsible role in the lives of his two daughters who continue to suffer the effects of the past sexual abuse, or in the life of his severely psychologically disabled son.
Fourth, as a practical matter, Gregory B. remains incarcerated, and is unavailable to serve as a parenting resource for the children at issue in this case. (Testimony of Dr. Mantell.) As found in Part I. C., the respondent father was recently sentenced to serve five years of incarceration, upon his conviction for a crime of violence. Even upon completing this term of incarceration, he will be subject to five years of special parole as a part of his sentencing, remaining under the jurisdiction of the chairman of the Board of Parole.[39] (Exhibit 4, Court Exhibit 1.) During the special parole period, Gregory B.'s liberty will be subject to review and revocation by the chairman; should the chairman direct the respondent father's return to DOC custody for CT Page 12563 violation of his parole, he may be retained in prison for a period of time, or may be again paroled by the board.[40] While acknowledging that the respondent father's incarceration, in and of itself, does dictate the determination that he has failed to achieve rehabilitation, it would be disingenuous for the court to overlook the fact that while he is serving his sentence, Gregory B. will not have the ability to serve as a parenting resource for his children, because he will not physically be present to aid them in their daily lives, and because he will lack the ability to provide for their emotional support. Under these circumstances, while his status for the next few years will be governed by the DOC or the Board of Parole, it would be unreasonable and unrealistic to identify Gregory B. as a reliable, accountable placement resource for his children.
In deciding the failure to rehabilitate issues, the court has remained aware that the evidence in this case does not reflect that specific steps were ever imposed upon Gregory B. Where, as here, the petitioner has based her TPR petition upon § 17a-112 (j) (3) (B) (i), however, our courts have determined that the use of specific steps is not requisite to assessment of the degree to which a parent has, or has not, achieved rehabilitation in the context of a child protection case. The Appellate Court has repeatedly confirmed that, "[i]n determining whether a parent has achieved sufficient personal rehabilitation, a court may consider whether the parent has corrected the factors that led to the initial commitment, regardless of whether those factors were included in specificexpectations ordered by the court or imposed by the department. See In reMichael M., 29 Conn. App. 112, 125, 614 A.2d 832 (1992); see also In reMigdalia M., [supra, 6 Conn. App. 206]." (Emphasis added.) In re VincentD., 65 Conn. App. 658, 670, 783 A.2d 534 (2001). In its totality, the clear and convincing evidence in this case compels the conclusion that Gregory B. remains unavailable to participate. in a rehabilitation regimen and thus remains without the qualities necessary to successfully parent any of his children. The evidence further clearly and convincingly proves that each of the children has special needs which cannot be met by their biological father, and that Gregory B. accordingly lacks the ability to assume a responsible position in the children's lives within a reasonably foreseeable time in the future. Accordingly, based on the clear and convincing evidence presented in this case, the court finds that the petitioner has proved Gregory B.'s failure to achieve rehabilitation within the meaning of § 17a-112 (j) (3) (B).
 II. D. STATUTORY GROUNDS FOR TERMINATION — LACK OF ONGOING PARENT-CHILD RELATIONSHIP — § 17a-112 (j) (3) (D)
The petitioner next alleges that because no ongoing parent-child Greg CT Page 12564 relationship exists between Gregory B. and any of his offspring, and because the children's best interests will not be served by allowing additional time for this relationship to be developed, the TPR petition should be granted pursuant to General Statutes § 17a-112 (c) (3) (D).[41] Applying the requisite legal standards, and complying with § 17a-112 (p), the court finds this matter in favor of the petitioner.
The relevant legal algorithm first requires the court to determine whether a parent-child relationship exists between Gregory B. and Samantha, Julie or Kevin.[42] In re Jonathon G., supra,63 Conn. App. 525. The evidence clearly and convincingly proves that there is no extant relationship between the respondent father and any of the children at issue in this case.[43] The evidence clearly and convincingly establishes that Gregory B. has never "met on a day to day basis the physical, emotional, moral and educational needs" of Samantha, Julie or Kevin. § 17a-112 (c) (3) (D). He has never provided any financial support for his children, and never protected them from Janice K.'s neglect. (Exhibit 13.) Absent from their lives from 1993 until the court hearing in February 2000, Gregory B. advised DCF that he was not available as a placement resource, and that he wanted to have nothing to do with his children. (Exhibit 13.) When he asked for visitation during the summer of 2000, Gregory B. explained that he wanted to have his daughters relate what Roger B. had done them; even at that time, he was not interested in establishing a nurturing, comforting parental relationship with his offspring. DCF reasonably withheld visitation at that time, in appropriate reliance upon the recommendations of the children's therapists who advised that contact with Gregory B., from whom they had been separated for so long, could have an adverse effect upon these children who were already challenged by behavioral issues. (Testimony of Michelle W.) The root cause for the absence of ongoing parent-child relationships in this case was succinctly identified by Dr. Krulee, the court-appointed psychiatric evaluator, who stated: "[Gregory B.] does appear to have a genuine interest in the current welfare of his children. However, by virtue of the fact that he has not seen them in over six years, he should be considered estranged from them." (Exhibit 16.)
In discerning whether a parent-children relationship exists, the court must also determine whether any of the children maintain any present feelings for Gregory B. and, if so, whether those feelings are of a positive nature. In re Jonathon G., supra, 63 Conn. App. 525. Samantha and Julie have scant extant memories related to her biological father; these memories pertain to things with which he was associated, such as a motorcycle or cigarettes, but not to any meaningful relationship. CT Page 12565 (Testimony of Brenda P.) Neither Samantha nor Julie have any desire to pursue a relationship with Gregory B., and they have specifically asked that his parental rights be terminated. (Exhibit 12.) Although they are of sufficient age to have an intellectual understanding of the role Gregory B. has planted in their biological lives, the clear inference is that neither child maintains any positive feelings for her father.[44]
When Kevin speaks of a `father' he is referencing Roger B., his mother's former boyfriend with whom the family lived for a number of years, and who is alleged to have subjected all three children to abuse. Kevin has never mentioned Gregory B., has never met him, and has no feelings for him as a person or entity. (Testimony of Michelle W.)
As it is thus apparent that no parent-child relationship exists between Gregory B. and any of his progeny, the court is next called to assess whether it would be detrimental to the children's best interests to allow additional time for a parenting relationship to be developed with their biological father. In re Jonathon G., supra, 63 Conn. App. 525. As fully discussed in Parts II. B. and C., Gregory B. has abandoned his children, and he has not achieved a sufficient degree of rehabilitation from his inherent personality disorders and psychological conditions to enable one to reasonably foresee that he will be able to resume a responsible role in their lives at any time in the future. Each of the children at issue in this case has special emotional needs; Samantha and Julie remain in counseling to address their history of sexual abuse, and Kevin requires even more structured. specialized attention in his living environment, in order to enhance his ability to deal with his diagnosed mental health conditions. Given Gregory B.'s limited ability to manage his own life, it would be unreasonable to conclude that the respondent father is capable of parenting his children and addressing their special needs in an organized and effective manner. Furthermore, Gregory B. will remain incarcerated for a prolonged period of time following the resolution of the TPR petition against him, and because he will be subject to five years of special parole after his discharge from the DOC. he is simply not available to serve as a parent to Samantha, Julie or Kevin under the circumstances of this case. Considering all of these factors. the totality of the evidence clearly and convincingly establishes that would not serve the children's best interests to allow additional time for a parenting relationship to be developed with Gregory B. In re Jonathon G., supra, 63 Conn. App. 525.
"It is reasonable to read the language of no ongoing parent-child relationship to contemplate a situation in which, regardless of fault, a child either has never known his or her parents, so that no relationship has ever developed between them, or has definitively lost that relationship, so that despite its former existence it has now been CT Page 12566 completely displaced." (Citations omitted.) In re John G.,56 Conn. App. 12, 22, 740 A.2d 496 (1999). Such construction is applicable to the present case, where the clear and convincing evidence establishes that any valid parenting relationship that Gregory B. may have developed with his children has been definitively lost due to his long-term absence and to the present incarceration which was the consequence of his violent actions. As the clear and convincing evidence in this case establishes that no ongoing parent-children relationship exists between Gregory B. and his children, and that it is not in the best interests of the children to allow more time for Gregory B. to develop a relationship with their biological father, the petitioner has met her burden of proof under § 17a-112 (j) (3) (D). In re JonathonG., supra, 63 Conn. App. 525; In re John G., supra, 56 Conn. App. 22.
 II. E. STATUTORY GROUNDS FOR TERMINATION — FAILURE TO REHABILITATE WITH PREVIOUS TERMINATION OF PARENTAL RIGHTS — § 17a-112 (j) (3) (E)
The petitioner also claims that the statutory grounds for termination established by General Statutes § 17a-112 (j) (3) (E)[45] exist in this case, supporting termination of Gregory B's parental rights. As found in Part I. A., Gregory B.'s parental rights to his children Jamie and Steven were terminated by court order on July 9, 1999 pursuant to a petition filed by DCF. Kevin was born on May 7, 1994; the TPR petition was filed against Gregory B. on April 16, 2001, prior to Kevin's seventh birthday. Adopting the discussion concerning Gregory B.'s failure to rehabilitate as set forth in Part II. C., the court here finds, by clear and convincing evidence, that the petitioner has met her burden of proving the statutory grounds established by § 17a-112 (j) (3) (E) as to the respondent father and Kevin B.
 III. DISPOSITION
As the court has concluded that statutory grounds for termination exist, it next "must determine whether termination is in the best interests of the child." (Citation and quotation marks omitted.) In reQuanitra M., supra, 60 Conn. App. 103. In this dispositional phase the court has considered the evidence and testimony related to circumstances and events through the close of evidence. Practice Book 33-5.
III. A. SEVEN STATUTORY FINDINGS
The court has made each of the seven written factual findings required by General Statutes § 17a-112 (k) based upon the clear and convincing evidence presented at trial, and has considered the evidence relevant to CT Page 12567 each of these findings in deciding whether to terminate parental rights. See In re Jonathon G., supra, 63 Conn. App. 528. The court notes that such findings are required as to Gregory B., only, in light of the valid consents to TPR provided by Janice K. § 17a-112 (k).
III. A. 1. TIMELINESS, NATURE AND EXTENT OF SERVICES — §17a-112 (k) (1)
On February 7 and May 9, 2001, as described in Part II. B., the court found that extension of services was inappropriate and unnecessary for Gregory B. These findings were consistent with the trial evidence which clearly shows that in February 2000, Gregory B. expressed his lack of interest in the children, and that he showed only minimal interest in them prior to his incarceration, and no interest thereafter. Prior to the issuance of the OTC in February 2000, no services were offered Gregory B. "as his whereabouts were unknown and he had not been a part of his children's lives for approximately six years." (Exhibit 13.) As found in Part II. A., the incarceration which commenced on October 25, 2000 rendered DCF unable to provide reunification or rehabilitation services for him.
III. A. 2. REUNIFICATION EFFORTS PURSUANT TO FEDERAL LAW — §17a-112 (k) (2)
The court finds that DCF made reasonable efforts to reunite the family pursuant to the federal Adoption Assistance and Child Welfare Act of 1980, as amended, under the circumstances of this case. Furthermore, in Part II. A., the court found by clear and convincing evidence that Gregory B. is unable or willing to benefit from reunification, and referenced the court's prior relevant finding that such efforts are not appropriate.
III. A. 3. COMPLIANCE WITH COURT ORDERS — § 17a-112 (k) (3)
No court orders were in effect regarding Gregory B. prior to his arrest in October 2000.
III. A. 4. THE CHILDREN'S FEELINGS AND EMOTIONAL TIES — §17a-112 (k) (4)
As found in Part II. D., the three children at issue in this case have no measurable feelings for or emotional ties to Gregory B. Since March of 2000. Samantha and Julie have stated that they do not want to return to Janice K.'s custody. Julie would like to continue to see Janice K., but Samantha has no such desire. Both girls are attached to their foster CT Page 12568 parents, and have consistently stated that they wish to remain with Brenda P. and her husband. Samantha desires to be adopted by them. (Exhibits 7, 13.) Similarly, Kevin has stated that he does not wish to live with Janice K., although he would like to see her. While he has expressed a desire to live with his sisters in their foster home, he is very happy living with Mr. and Mrs. B., whom he calls "Nonny" and "Poppy." (Exhibit 13.) Kevin has no recollection of Gregory B. He identifies Roger B., who had abused him, as his psychological father. (Testimony of Michelle W.)
The siblings continue to visit with each other, and there is a firm bond between them. (Testimony of Michelle W.)
III. A. 5. AGES OF THE CHILDREN — § 17a-112 (k) (5)
Samantha was born on December 1986; she is nearly sixteen years old. Julie was born on November 1991, and is nearing her eleventh birthday. Kevin was born on May 1994; he is approximately eight and a half years old.
III. A. 6. PARENTS' EFFORTS TO ADJUST THEIR CIRCUMSTANCES —§ 17a-112 (k) (6)
The court finds that Gregory B. did not maintain adequate or appropriate contact with DCF or with the foster parents regarding the status of the children involved. The court further finds that Gregory B. has not made realistic and sustained efforts to conform his conduct to even minimally acceptable parental standards. As found in Parts II. A. and C., giving him additional time would not likely bring his performance, as a parent, within acceptable standards sufficient to make it in the best interests of the children to be reunited with him.
 III. A. 7. EXTENT TO WHICH PARENTS WERE PREVENTED FROM MAINTAINING RELATIONSHIPS WITH THE CHILDREN — § 17a-112 (k) (7)
The court finds that no unreasonable conduct by the child protection agency or foster parents prevented Gregory B. from maintaining relationships with the children at issue in this case, nor did the economic circumstances of the parent cause prevent such relationships, although the limitations and restrictions inherent in the foster care system were in effect.[46] In the summer of 2000, when DCF deferred providing visitation to Gregory B. notwithstanding his request for contact with his offspring, the agency did so in reasonable reliance upon the recommendations of the children's therapists, who had indicated that visitation could be harmful after so long an absence, and given the children's circumstances. (Testimony of Michelle W., Dr. Krulee.) The CT Page 12569 testimony provided by Josephine B. indicates that Gregory B. is able to perform work which has value to others, such as painting, lawn work and roofing repairs. Although Gregory B. chooses not to accept compensation for this work, he is clearly able to earn income. (Testimony of Josephine B.) To the extent that Michael K. may have withheld information concerning Janice K.'s whereabouts from 1994 through October 2000, there is insufficient evidence from which the court could reasonably conclude that Gregory B. wished to contact her in order to nurture a relationship with his children; the children were never a subject of Gregory B.'s conversations with Michael K. (Testimony of Michael K.)
III. B. BEST INTERESTS OF THE CHILDREN
The court is next called upon to determine whether termination of the parental rights of Gregory B. and Janice K. would serve the children's best interests.[47] Applying the appropriate legal standards[48] to the facts which are clearly and convincingly apparent in this case, the court finds this issue in favor of the petitioner.
In determining whether termination of the respondents' parental rights would be in the children's best interests, the court has examined the multiple relevant factors, including the their interests in sustained growth, development, well-being, stability and continuity of their environment; their length of stay in foster care; the nature of their relationship with their foster parents and biological parents; their genetic bond to and the degree of contact maintained with the biological parents. In re Alexander C., 60 Conn. App. 555, 559, 760 A.2d 532 (2000);In re Shyina B., 58 Conn. App. 159, 167, 752 A.2d 1139 (2000); In reSavanna M., 55 Conn. App. 807, 816, 740 A.2d 484 (1999). In a matter such as this, the court is further called upon to balance the children's intrinsic needs for stability and permanency against the maintenance of any connection with his biological parents. See Pamela B. v. Ment,244 Conn. 296, 314, 709 A.2d 1089 (1998) (child's physical and emotional well-being must be weighed against the interest in preserving family integrity).
Under such scrutiny, the clear and convincing evidence in this matter establishes that it is not in the children's best interests to continue to maintain any legal relationship with either Janice K. or Gregory B. In this case, there was no evidence to suggest that Gregory B. had ever played a constructive and useful role as a parent to Samantha, Julie or Kevin. In re Sarah Ann K., supra, 57 Conn. App. 449. As found in Part II., Gregory B. has a fundamental inability to serve as a parenting resource for his children. He has abandoned them; he has no ongoing relationship with them; and their best interests cannot be served by CT Page 12570 allowing additional time for Samantha, Julie or Kevin to develop a relationship with Gregory B.
By her consent to termination, Janice K. has acknowledged that by retaining a legal relationship with her children, she cannot serve their best interests. Her conclusion is consistent with the evidence provided through Dr. Rosado's written report, indicating that any attachment between Janice K. and her children "was not entirely positive or psychologically healthy." (Exhibit 20.) Although they are able to maintain and desire physical closeness, their emotional connection is "dominated by irritability." (Exhibit 20.) Janice K.'s "periodic impairments in basic logical thinking," confusion, and inconsistent cognitive processing abilities have led to her "limited success in maintaining her parental capabilities."[49] (Exhibit 20.) As Janice K. has not regained the ability to psychologically or physically provide for her children, it is clear that their best interests will be served by terminating her parental rights, allowing the children to be freed for adoption and permanent incorporation into a structured, predictable and reliable family setting. (Exhibit 20.)
The court credits Dr. Rosado's opinion that in order to preserve the vestiges of healthy psychological development, all three children need permanency now, with placement in stable, nurturing homes, and adoption if that option becomes available. (Testimony of Dr. Rosado, Ronda C.) Insofar as Kevin is concerned, the Yale staff determined that given his "tendency to view the environment as dangerous and uncontrollable, it iscritical that his day-to-day life be as consistent as possible." (Emphasis added.) (Exhibit 23.) Kevin's therapist at the START program, where he lived from August 2001 through January 2002, confirmed this child's need for a stable home environment with consistent, firm limits. (Testimony of Ronda C.) Taken as a whole, the evidence clearly and convincingly reveals that neither Janice K. nor Gregory B. is able to provide such a structured, secure home setting for the children, and further establishes that neither respondent is equipped to deal with any of the children's special needs.
Our courts have recognized that "long-term stability is critical to a child's future health and development." In re Eden F., supra,250 Conn. 709. Furthermore, "[b]ecause of the psychological effects of prolonged termination proceedings on young children, time is of the essence . . ." when resolving issues related to the permanent or temporary care of neglected children. In re Alexander V.,25 Conn. App. 741, 748, 596 A.2d 930 (1992); see also In re JuvenileAppeal (84-CD), 189 Conn. 276, 292, 455 A.2d 1313 (1983). The court is constrained to agree with the children's counsel and Samantha's GAL and CT Page 12571 concludes that the clear and convincing evidence establishes that the children at issue in this case have each gained stability and security in the settings in which they are now placed. Dealing with the scars left by their past abuse yet continuing their academic success while residing in the well-organized. structured home maintained by Brenda P. and her husband, Julie has earned a place on the "Wall of Honor" at her school. while Samantha participates in Junior ROTC and hopes to participate with her high school's volunteer ambulance program (Testimony of Brenda P.) Kevin's ability to deal with the stress of daily life is also is improving under the loving care and attention of Mrs. B., an experienced foster mother.[50] (Testimony of Mrs. B.)
These children were removed from Janice K.'s care in February 2000, long after they had been abandoned by Gregory B. After more than two and a half years in foster care, it is clear that their interests in "sustained growth, development, well-being and continuity and stability of [their] environment" cannot be met by either of their biological parents. In re Shyina B., supra, 58 Conn. App. 167. Having balanced the children's intrinsic need for stability and permanency against the benefits of maintaining a connection with either Gregory B. or Janice K., the clear and convincing evidence in this case establishes that Samantha, Julie and Kevin are entitled to the benefit of ending, without further delay, the uncertainty of the issues raised through this litigation. Pamela B. v. Ment, supra, 244 Conn. 313-314.
Accordingly, with respect to the best interests of the children contemplated by § 17a-112 (j) (2), by clear and convincing evidence, and based upon all of the foregoing, including the testimony and evidence presented, the court finds that termination of the parental rights of Gregory B. and Janice K. is in the best interest of the children at issue in this case.
 IV. ORDER OF TERMINATION
WHEREFORE, after due consideration of the children's sense of time, their need for a secure and permanent environment, the relationship Samantha and Julie have with their foster parents, Kevin's continuing need for specialized care, and the totality of circumstances; and having considered all the statutory criteria and having found by clear and convincing evidence that grounds exist for termination of parental rights: and having concluded that the termination of the parental rights at issue will be in the children's best interests, the court issues the following ORDERS:
That the parental rights of Gregory B. and Janice K. are hereby CT Page 12572 terminated as to the children Samantha B., Julie B. and Kevin B.
That the Commissioner of the Department of Children and Families is hereby appointed the statutory parent for each of the children for the purpose of securing an adoptive family or other permanent placement for them.
That permanency plans shall be submitted within 30 days of this judgment, and that such further reports shall be timely presented to the court, as required by law. That primary consideration for adoption of Samantha and Julie shall be offered to their current foster parents.
BY THE COURT,
N. Rubinow, J.